## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| LEON A. FISCHER, derivatively on behalf of CABOT OIL & GAS CORPORATION n/k/a COTERRA ENERGY INC., <br><br>      Plaintiff, <br><br>      v. <br><br> DAN O. DINGES, SCOTT C. SCHROEDER, PHILLIP L. STALNAKER, DOROTHY M. ABLES, RHYS J. BEST, ROBERT S. BOSWELL, AMANDA M. BROCK, PETER B. DELANEY, ROBERT KELLEY, ROBERT L. KEISER, W. MATT RALLS, and MARCUS A. WATTS, <br><br>      Defendants, <br><br>      and <br><br> CABOT OIL & GAS CORPORATION n/k/a COTERRA ENERGY INC., <br><br>      Nominal Defendant. | Case No. 4:24-cv-02223 |

## **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## TABLE OF CONTENTS

I.      NATURE AND SUMMARY OF THE ACTION ..............................................................2

II.     JURISDICTION AND VENUE.................................................................................5

III.    PARTIES ...........................................................................................................6

IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS.......................................................15

        A.      Fiduciary Duties.................................................................................15

        B.      Corporate Governance Guidelines and Code of Business Conduct ....................16

        C.      Environmental, Health and Safety Committee Charter.........................................18

V.      FACTUAL BACKGROUND ..................................................................................19

        A.      Fracking Is an Inherently Dangerous Activity ....................................................19

        B.      Cabot Operates in a Highly Regulated Industry..................................................20

                1. The Pennsylvania State Constitution ..........................................................22

                2. The Pennsylvania Clean Streams Law ........................................................23

                3. The Pennsylvania Department of Environmental Protection ...........................24

                4. The Oil and Gas Act.................................................................................25

        C.      Cabot's Drilling Operations in Pennsylvania Form a Substantial Part of Its
                Business, and the Implicated Wells Produced a Substantial Portion of the
                Company's Revenue ...............................................................................................25

        D.      Cabot's Drilling Operations Cause an Explosion at a Local Residence ..............30

        E.      Cabot's Poor Environmental Controls Result in the 2009 Consent Order...........31

        F.      Cabot Fails to Live Up to the 2009 Consent Order .............................................32

        G.      Cabot's Continued Violations Result in the December 15, 2010 Consent
                Order .....................................................................................................................35

VI.     THE INDIVIDUAL DEFENDANTS BREACHED THEIR FIDUCIARY DUTY
        OF LOYALTY....................................................................................................37

        A.      The 2020 Grand Jury Presentment......................................................................38

B.     The Pennsylvania Attorney General Files Criminal Charges Against the Company ......................................................................................... 41

VII.    THE INDIVIDUAL DEFENDANTS MAKE AND APPROVE FALSE AND MISLEADING STATEMENTS ........................................................................ 44

A.     False and Misleading Statements ........................................................... 44

B.     The Truth Begins to Emerge While the Individual Defendants Continue to Issue Materially Misleading Statements .............................................. 55

C.     Cabot's Own Former Geologist Confirms Statements at Issue are False and Misleading ........................................................................................ 58

D.     Cabot's Former Environmental Health & Safety Manager Likewise Confirms Statements at Issue are False and Misleading ....................... 63

E.     Cabot's Former Environmental Health & Safety Specialist Likewise Confirms Statements at Issue are False and Misleading ....................... 64

VIII.   DEFENDANT DINGES SELLS STOCK AT ARTIFICIALLY INFLATED PRICES BASED ON NON-PUBLIC INFORMATION ................................... 66

IX.    THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO REPURCHASE STOCK AT ARTIFICIALLY INFLATED PRICE ............... 66

X.     DAMAGES TO THE COMPANY ................................................................. 68

XI.    DERIVATIVE AND DEMAND REFUSED ALLEGATIONS ..................... 69

COUNT I ......................................................................................................... 72

COUNT II ........................................................................................................ 72

COUNT III ....................................................................................................... 74

COUNT IV ....................................................................................................... 75

COUNT V ......................................................................................................... 76

COUNT VI ....................................................................................................... 77

PRAYER FOR RELIEF .................................................................................. 77

JURY DEMAND ............................................................................................. 79

Plaintiff Leon Fischer ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Cabot Oil & Gas Corporation n/k/a Coterra Energy Inc. ("Cabot" or the "Company"),[1] certain current and former members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, insider trading (*i.e.*, *Brophy* claim), waste of corporate assets, and unjust enrichment, and seeking contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including, but not limited to: (a) review and analysis of public filings made by Cabot and other persons with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, financial statements, and other publications caused to be disseminated by certain of the defendants and other persons; (c) review and analysis of news articles, stockholder communications, and postings on Cabot's website concerning the Company's public statements; (d) review and analysis of court filings in the related securities class action lawsuit alleging violations of federal securities law based on similar facts and circumstances alleged herein, styled *Delaware County Employees Retirement System v. Cabot Oil & Gas Corporation, et al.*, Case No. 4:21-cv-2045 (the "Securities Class Action"), which is currently pending in the United States District Court for the Southern

---

[1]    Subsequent to the commencement of this derivative litigation, Cabot merged with Cimarex Energy Co. ("Cimarex") and is now known as Coterra Energy Inc. ("Coterra"). For consistency, the Complaint will refer to the Nominal Defendant Cabot by its former name, unless specifically discussing elements unique to the post-merger entity Coterra.

District of Texas[2]; and (e) review and analysis of other publicly available information concerning Cabot, the defendants, and other persons.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant Cabot against certain of its directors and officers for breach of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of law.

2.    After a water well adjacent to a home exploded in January 2009, the Pennsylvania Department of Environmental Protection (the "PaDEP") began investigating Cabot's gas wells. After interviewing dozens of local residents who experienced health problems, and conducting its own sampling analysis of the impacted water, the PaDEP found that Cabot's oil and gas drilling operations caused methane gas to migrate into Pennsylvania residents' water wells, particularly in the area of Dimock Township, Susquehanna County.  Cabot entered into a 2009 consent order and settlement agreement to correct the problem.

3.    Unfortunately, Cabot failed to abide by the terms of the 2009 consent order and settlement agreement.  On April 15, 2010, the PaDEP announced that it caused Cabot to enter into another, broader, consent order.  The then-PaDEP Secretary, John Hanger ("Hanger"), stated in a related press release that "Cabot had every opportunity to correct these violations, but failed to do so.  Instead, it chose to ignore its responsibility to safeguard the citizens of this community and to protect the natural resources there."

---

[2]    References to the "Securities Fraud Complaint" are to the operative complaint pending in the Securities Class Action, filed at Docket Entry 110 in that matter. References to the "Securities Fraud Plaintiffs" refer to the lead plaintiff in that action, Delaware County Employees Retirement System, and the named plaintiff Iron Workers District Council (Philadelphia and Vicinity) Retirement and Pension Plan. *See* Securities Fraud Complaint at ¶¶ 18-19.

4.      Cabot entered into a consent order and settlement agreement on December 15, 2010, promising to "take all actions necessary … to comply with all applicable environmental laws and regulations, including all applicable provisions" of Pennsylvania's Clean Streams Law, Oil and Gas Act, and related regulations.  The PaDEP also issued a moratorium on Cabot's drilling of new gas wells within a nine-mile radius of the affected area.

5.      On July 26, 2019, Cabot disclosed that it had received NOVs from the PaDEP in June and November 2017—within months of entering into a consent order—related to complaints by local residents in Susquehanna County about their drinking water supply. The Company also disclosed that it had received two proposed consent orders from the PaDEP, which collectively would result in a civil penalty up to $570,000 and would require Cabot to submit "a detailed written remediation plan, continue water sampling and other investigative measures."

6.      Pennsylvania Attorney General Josh Shapiro ("AG Shapiro") began an investigation into Cabot in 2018, eventually empaneling a grand jury.  The grand jury found that "*over a period of many years, and despite mounting evidence, Cabot Oil & Gas failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration*," and bluntly called out "*Cabot's long-term indifference to the damage it caused to the environment and citizens of Susquehanna County*."[3]  The grand jury concluded that criminal charges were appropriate.

7.      On March 3, 2020, media reported that AG Shapiro was conducting "more than a dozen ongoing criminal investigations into fracking and pipeline companies" and that "criminal charges" were expected "in the near future."

[3]      Unless otherwise specified, all emphasis in quoted material is supplied and all internal quotation marks, citations, and footnotes are omitted.

3

8.    AG Shapiro filed criminal charges against Cabot on June 15, 2020.  Regarding the Company's failure to remediate the NOVs between December 15, 2010 and January 2020, AG Shapiro noted that "Cabot has ***only recently*** taken steps to remediate them."  The Pennsylvania Attorney General's office charged Cabot with fifteen criminal counts following a grand jury investigation that found the Company failed to fix faulty gas wells that are leaking methane into residential water supplies. As a result, the Company was charged with ***knowingly*** discharging or permitting the flow of methane into groundwater, resulting in several felony counts for violations of Pennsylvania's Clean Streams Law.  AG Shapiro succinctly stated in connection with the announcement of charges: "***Cabot took shortcuts that broke the law, damaged our environment, harming our water supplies and endangering Pennsylvanians.  They put their bottom line ahead of the health and safety of our neighbors.***"  AG Shapiro's charges against Cabot were based, in part, on Grand Jury testimony that Cabot "undertook ***little to no remedial work*** on its gas wells, the source of the problem, until 18 months ago [***mid-2018***]." The Company was charged with violating, *inter alia*, the Clean Streams Law, Prohibition Against Discharge of Industrial Wastes, 35 P.S. § 691.301, Prohibition Against Other Pollutions, 35 P.S. § 691.401 and Unlawful Conduct, 35 P.S. § 691.611.

9.    Between October 23, 2015 and June 12, 2020, the Individual Defendants issued public statements that Cabot "substantially compl[ied] with the Clean Water Act and related federal and state regulations."

10.    On December 28, 2020, the PaDEP and Cabot entered into two new consent orders and settlement agreements for continuing violations stemming from two 2017 NOVs.  Cabot was ordered to pay penalties of $180,000 and $300,000.

4

11.     In January 2022, counsel for the Company waived the preliminary criminal hearing, allowing the charges brought against Cabot to move forward and potentially go to trial. A prosecutor on the criminal case stated on January 7, 2022 that Cabot's waiver is a "recognition that the evidence against [Cabot] is sufficient to proceed in the criminal process."

12.     As a direct result of this unlawful course of conduct, the Company has suffered and will continue to suffer harm, as alleged herein. Cabot remains the subject of the Securities Class Action, originally filed in the Middle District of Pennsylvania on behalf of investors who purchased Cabot's shares, which was subsequently transferred to the United States District Court for the Southern District of Texas. That matter remains pending, and the Company continues to incur costs and expend resources in its defense.

13.     Plaintiff made a pre-suit demand on the Company's current Board (*i.e.*, the Coterra Board of Directors) on March 21, 2024 to investigate, remediate, and prosecute the claims alleged herein. As of the filing of this Complaint, the Coterra Board of Directors has neither commenced action against any of the Defendants, nor has agreed to securing any tolling agreements to protect the Company against the running of the statute of limitations, despite having months to do so before the statute of limitations had run and despite multiple entreaties from Plaintiff. As such, Plaintiff considers its pre-suit demand wrongfully refused by the Coterra Board of Directors. Accordingly, Plaintiff now brings this action on behalf of the Company to prevent irreparable harm to the Company.

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: contribution for violations of Section 10(b) of the Exchange Act of 1934. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and defendants are citizens of different states and the matter in controversy exceeds

$75,000, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.    PARTIES

### Plaintiff

16.     Plaintiff Leon Fischer is a current stockholder of Cabot. Plaintiff Leon Fischer has continuously owned his Cabot stock at all relevant times, and is a citizen of Kansas.

### Nominal Defendant

17.     Nominal Defendant Cabot is a Delaware corporation with principal executive offices located at Three Memorial City Plaza 840 Gessner Road, Suite 1400, Houston, Texas. Accordingly, Cabot is a citizen of Delaware and Texas.  Cabot is an oil and gas company that operates within the natural gas segment.  Cabot explores, exploits, develops, produces, and markets oil and gas properties in the United States.  Cabot primarily focuses on the Marcellus Shale, with approximately 175,000 net acres in the dry gas window of the basin located in Susquehanna County, Pennsylvania.   As of December 31, 2020, Cabot Oil & Gas Corporation had 503 employees.  On October 1, 2021, Cabot completed a merger with Cimarex Energy Co. ("Cimarex") on October 1, 2021, and upon closing of the transaction the Company changed its name to Coterra Energy Inc.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "CTRA."

**Defendants**

18.     Defendant Dan O. Dinges ("Dinges") has served as Executive Chairman since October 2021, and also served as President, Chief Executive Officer ("CEO") and a Chairman of the Board from May 2002 to September 2021. Dinges survived the Cabot/Cimarex Merger, and currently sits on Coterra's Board of Directors, serving as its Executive Chairman. Defendant Dinges is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, promulgated thereunder. Defendant Dinges knowingly, recklessly, or with gross negligence violated environmental laws and regulations and failed to maintain adequate internal controls to ensure compliance with environmental laws and regulations.   Defendant Dinges also knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's purported compliance with environmental laws and regulations.   He is a citizen of Texas. According to Cabot's proxy statements, Dinges received the following compensation for fiscal years 2016 through 2020:

| Fiscal Year | Salary | Stock Awards | Non-Equity Incentive Plan | All other compensation | Total |
|---|---|---|---|---|---|
| 2020 | $1,142,316 | $11,267,676 | $1,430,000 | $354,714 | $14,194,706 |
| 2019 | $1,090,392 | $10,441,509 | $1,930,500 | $368,525 | $13,830,926 |
| 2018 | $1,035,581 | $9,546,325 | $2,100,000 | $368,414 | $13,050,320 |
| 2017 | $960,580 | $8,709,748 | $2,437,500 | $293,205 | $12,401,033 |
| 2016 | $900,016 | $8,327,237 | $1,856,240 | $228,334 | $11,311,837 |

19.     Defendant Scott C. Schroeder ("Schroeder") has served as Executive Vice President and Chief Financial Officer ("CFO") of the Company since February 2014. Schroeder survived the Cabot/Cimarex Merger, and currently is Coterra's Executive Vice President and Chief Financial Officer. Defendant Schroeder is named as a defendant in the Securities Class Action complaint that alleges he violated section 10(b) and 20(a) of the Securities Exchange Act of 1934

and SEC Rule 10b-5, promulgated thereunder. Defendant Schroeder knowingly, recklessly, or with gross negligence violated environmental laws and regulations and failed to maintain adequate internal controls to ensure compliance with environmental laws and regulations. Defendant Schroeder also knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's purported compliance with environmental laws and regulations. He is a citizen of Texas. According to Cabot's proxy statements, Schroeder received the following compensation for fiscal years 2016 through 2020:

| Fiscal Year | Salary | Stock Awards | Non-Equity Incentive Plan | All other compensation | Total |
|---|---|---|---|---|---|
| 2020 | $653,206 | $5,121,680 | $691,900 | $207,331 | $6,674,117 |
| 2019 | $623,437 | $4,746,113 | $934,065 | $212,467 | $6,516,082 |
| 2018 | $590,402 | $4,295,827 | $960,000 | $196,616 | $6,042,845 |
| 2017 | $535,590 | $3,981,597 | $1,100,000 | $165,258 | $5,782,445 |
| 2016 | $475,010 | $3,843,343 | $783,750 | $129,845 | $5,231,948 |

20.    Defendant Phillip L. Stalnaker ("Stalnaker") has served the Company in various executive capacities since 2009, and joined the Company in 2000. Stalnaker survived the Cabot/Cimarex Merger, and currently is Coterra's Senior Vice President of the Marcellus Business Unit. Defendant Stalnaker is named as a defendant in the Securities Class Action complaint that alleges he violated section 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, promulgated thereunder. Defendant Stalnaker knowingly, recklessly, or with gross negligence violated environmental laws and regulations and failed to maintain adequate internal controls to ensure compliance with environmental laws and regulations. Defendant Stalnaker also knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's purported compliance with environmental laws and regulations. He is a citizen of Pennsylvania. According to Cabot's proxy statements, Stalnaker received the following compensation for the fiscal years 2016 through 2020:

| Fiscal Year | Salary | Stock Awards | Non-Equity Incentive Plan | All other compensation | Total |
|---|---|---|---|---|---|
| 2020 | $462,132 | $1,510,615 | $356,000 | $101,571 | $2,430,318 |
| 2019 | $440,208 | $1,406,618 | $480,600 | $105,816 | $2,433,242 |
| 2018 | $413,282 | $1,193,269 | $504,000 | $91,505 | $2,202,056 |
| 2017 | $378,276 | $995,393 | $577,500 | $91,580 | $2,042,749 |
| 2016 | $350,002 | $960,831 | $433,130 | $79,275 | $1,823,238 |

21.     Defendant Dorothy M. Ables ("Ables") has served as a director of the Company since 2015.  She is Chairman of the Audit Committee and has been since at least March 2019, and a member of that committee since at least March 2016 and is also a member of the Compensation Committee. Defendant Ables knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Cabot to: (i) violate environmental laws and regulations and failed to maintain adequate internal controls to ensure compliance with environmental laws and regulations; and (ii) make improper statements in the Company's press releases and public filings concerning the Company's purported compliance with environmental laws and regulations.  She is a citizen of Virginia. According to Cabot's proxy statements, Ables received the following compensation for fiscal years 2016 through 2020:

| Fiscal Year | Fees | Stock Awards | All other compensation | Total |
|---|---|---|---|---|
| 2020 | $95,000 | $230,006 | $21,866 | $346,872 |
| 2019 | $90,000 | $230,039 | $16,265 | $336,304 |
| 2018 | $75,000 | $230,175 | $8,003 | $313,178 |
| 2017 | $75,000 | $200,010 | $6,236 | $281,246 |
| 2016 | $62,500 | $200,003 | $712 | $263,215 |

22.     Defendant Rhys J. Best ("Best") served as a director of the Company from 2008 to October 2021. Defendant Best was a member of the Audit Committee from at least March 2015 to at least March 2017. Defendant Best knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Cabot to: (i) violate environmental laws and regulations and failed to maintain adequate internal controls to ensure compliance with environmental laws and regulations;

and (ii) make improper statements in the Company's press releases and public filings concerning the Company's purported compliance with environmental laws and regulations. He is a citizen of Texas. According to Cabot's proxy statements, Best received the following compensation for fiscal years 2016 through 2020:

| Fiscal Year | Fees | Stock Awards | All other compensation | Total |
|---|---|---|---|---|
| 2020 | $95,000 | $230,006 | $54,575 | $379,581 |
| 2019 | $95,000 | $230,039 | $43,238 | $368,277 |
| 2018 | $93,750 | $230,175 | $28,446 | $352,371 |
| 2017 | $90,000 | $200,010 | $17,887 | $307,897 |
| 2016 | $90,000 | $200,003 | $7,598 | $297,601 |

23.    Defendant Robert S. Boswell ("Boswell") has served as a director of the Company since 2015. Boswell also survived the Cabot/Cimarex Merger, currently sits on Coterra's Board of Directors, and is a member of its Audit Committee and its Environment, Health & Safety Committee. Defendant Boswell also served as Chairman of the Environment, Health and Safety Committee from at least March 2018 to at least March 2021. Defendant Boswell knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Cabot to: (i) violate environmental laws and regulations and failed to maintain adequate internal controls to ensure compliance with environmental laws and regulations; and (ii) make improper statements in the Company's press releases and public filings concerning the Company's purported compliance with environmental laws and regulations. He is a citizen of Colorado. According to Cabot's proxy statements, Boswell received the following compensation for fiscal years 2016 through 2020:

| Fiscal Year | Fees | Stock Awards | All other compensation | Total |
|---|---|---|---|---|
| 2020 | $90,000 | $230,006 | $22,811 | $342,817 |
| 2019 | $90,000 | $230,039 | $16,044 | $336,083 |
| 2018 | $88,750 | $230,175 | $7,546 | $326,471 |
| 2017 | $75,000 | $200,010 | $6,602 | $281,612 |
| 2016 | $62,500 | $200,003 | $648 | $263,151 |

24.     Defendant Amanda M. Brock ("Brock") has served as a director of the Company since 2017.  Brock survived the Cabot/Cimarex Merger, currently sits on Coterra's Board of Directors, and is a member of its Compensation Committee and its Environment, Health & Safety Committee. Defendant Brock was also a member of the Audit Committee from at least March 2018 to at least March 2021. Defendant Brock knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Cabot to: (i) violate environmental laws and regulations and failed to maintain adequate internal controls to ensure compliance with environmental laws and regulations; and (ii) make improper statements in the Company's press releases and public filings concerning the Company's purported compliance with environmental laws and regulations.  She is a citizen of Texas. According to Cabot's proxy statements, Brock received the following compensation for fiscal years 2017 through 2020:

| Fiscal Year | Fees | Stock Awards | All other compensation | Total |
|---|---|---|---|---|
| 2020 | $75,000 | $230,006 | $13,311 | $318,317 |
| 2019 | $75,000 | $230,039 | $8,649 | $313,688 |
| 2018 | $75,000 | $230,175 | $2,656 | $307,831 |
| 2017 | $18,750 | $76,229 | $1,576 | $96,555 |

25.     Defendant Peter B. Delaney ("Delaney") served as a director of the Company from 2018 to October 2021.  He was a member of the Audit and Environment, Health and Safety Committees from at least March 2019 to at least March 2021. Defendant Delaney knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Cabot to: (i) violate environmental laws and regulations and failed to maintain adequate internal controls to ensure compliance with environmental laws and regulations; and (ii) make improper statements in the Company's press releases and public filings concerning the Company's purported compliance with environmental laws and regulations. He is a citizen of Oklahoma. According to Cabot's proxy statements, Delaney received the following compensation for fiscal years 2018 through 2020:

11

| Fiscal Year | Fees | Stock Awards | All other compensation | Total |
|---|---|---|---|---|
| 2020 | $75,000 | $230,006 | $11,730 | $316,736 |
| 2019 | $75,000 | $230,039 | $4,416 | $309,455 |
| 2018 | $6,250 | $77,507 | $225 | $83,982 |

26.     Defendant Robert Kelley ("Kelley") served as a director of the Company from 2003 to April 2021.  He was a Chair of the Audit Committee from at least March 2015 to at least March 2018, and a member of that committee from at least March 2015 to at least March 2021.  Defendant Kelley was also a member of the Environment, Health & Safety Committee from at least March 2015 to at least March 2017.  Defendant Kelley knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Cabot to: (i) violate environmental laws and regulations and failed to maintain adequate internal controls to ensure compliance with environmental laws and regulations; and (ii) make improper statements in the Company's press releases and public filings concerning the Company's purported compliance with environmental laws and regulations.  He is a citizen of Texas.  According to Cabot's proxy statements, Kelley received the following compensation for fiscal years 2016 through 2020:

| Fiscal Year | Fees | Stock Awards | All other compensation | Total |
|---|---|---|---|---|
| 2020 | $105,000 | $230,006 | $89,342 | $424,348 |
| 2019 | $110,500 | $230,039 | $72,935 | $412,974 |
| 2018 | $122,500 | $230,175 | $47,607 | $400,282 |
| 2017 | $115,000 | $200,010 | $31,884 | $346,894 |
| 2016 | $112,500 | $200,003 | $13,485 | $325,988 |

27.     Defendant Robert L. Keiser ("Keiser") was a Cabot director from February 2006 to May 2016.  Keiser was also a member of the Company's Audit Committee, Chair of the EHS Committee, and a member of that Committee in at least March 2015.  Defendant Keiser knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Cabot to: (i) violate environmental laws and regulations and failed to maintain adequate internal controls to ensure

12

compliance with environmental laws and regulations; and (ii) make improper statements in the Company's press releases and public filings concerning the Company's purported compliance with environmental laws and regulations. He is a citizen of Texas. According to Cabot's proxy statements, Keiser received the following compensation for fiscal year 2016:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $42,500 | $200,003 | $5,634 | $248,137 |

28.    Defendant W. Matt Ralls ("Ralls") served as a director of the Company from 2011 to October 2021. Defendant Ralls was Chair of the Environment, Health & Safety Committee from at least March 2016 to at least March 2017, and a member of that committee from at least March 2015 to at least March 2017. Defendant Ralls knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Cabot to: (i) violate environmental laws and regulations and failed to maintain adequate internal controls to ensure compliance with environmental laws and regulations; and (ii) make improper statements in the Company's press releases and public filings concerning the Company's purported compliance with environmental laws and regulations. He is a citizen of Texas. According to Cabot's proxy statements, Ralls received the following compensation for fiscal years 2016 through 2020:

| Fiscal Year | Fees | Stock Awards | All other compensation | Total |
|---|---|---|---|---|
| 2020 | $90,000 | $230,006 | $41,193 | $361,199 |
| 2019 | $90,000 | $230,039 | $32,880 | $352,919 |
| 2018 | $88,750 | $230,175 | $19,740 | $338,665 |
| 2017 | $95,000 | $200,010 | $12,959 | $307,969 |
| 2016 | $92,500 | $200,003 | $4,199 | $296,702 |

29.    Defendant Marcus A. Watts ("Watts") has served as a director of the Company since 2017. Watts survived the Cabot/Cimarex Merger, currently sits on Coterra's Board of Directors, and is a member of its Compensation Committee and is the Chair of its Governance and Social Responsibility Committee. He was a member of the Environment, Health, and Safety

Committee from at least March 2018 to at least March 2021. Defendant Watts knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Cabot to: (i) violate environmental laws and regulations and failed to maintain adequate internal controls to ensure compliance with environmental laws and regulations; and (ii) make improper statements in the Company's press releases and public filings concerning the Company's purported compliance with environmental laws and regulations. He is a citizen of Texas. According to Cabot's proxy statements, Watts received the following compensation for fiscal years 2017 through 2020:

| Fiscal Year | Fees | Stock Awards | All other compensation | Total |
|---|---|---|---|---|
| 2020 | $75,000 | $230,006 | $13,311 | $318,317 |
| 2019 | $75,000 | $230,039 | $8,641 | $313,680 |
| 2018 | $75,000 | $230,175 | $2,656 | $307,831 |
| 2017 | $18,750 | $76,229 | $2,777 | $97,756 |

30.    Dinges, Schroeder, Stalnaker, Ables, Best, Boswell, Brock, Delaney, Keiser, Kelley, Ralls, and Watts are sometimes referred to hereinafter as the "Individual Defendants."

**Relevant Non-Parties**

31.    Non-defendant Thomas E. Jorden ("Jorden") has served as Chief Executive Officer, President and a director of the Company since October 2021.

32.    Non-defendant Lisa A. Stewart ("Stewart") has served as the Company's Lead Director since October 2021.

33.    Non-defendant Frances M. Vallejo ("Vallejo") has served as a director of the Company since October 2021.

34.    Non-defendant Hans Helmerich ("Helmerich") has served as a director of the Company since October 2021.

35.    Non-defendant Paul N. Eckley ("Eckley") has served as a director of the Company since October 2021.

14

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.    Fiduciary Duties

36.    By reason of their positions as officers, directors, and/or fiduciaries of Cabot and because of their ability to control the business and corporate affairs of Cabot, at all relevant times, the Individual Defendants owed Cabot and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Cabot in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Cabot and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Cabot and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

37.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Cabot, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Cabot, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

38.    To discharge their duties, the officers and directors of Cabot were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Cabot were required to, among other things:

> (a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.     Corporate Governance Guidelines and Code of Business Conduct**

39.     Cabot holds its fiduciaries to specific corporate governance principles beyond the requirements of Delaware law.  In particular, in the Company's Corporate Governance Guidelines, Cabot describes the Board's duties to be undertaken by the Board and the its active oversight role the Board plays in the Company's business affairs.  In particular, the Corporate Governance Guidelines state that, in addition to its general oversight of management, the Board must "review[], approve[] and monitor[] financial plans, business strategies and major corporate actions"; "assess[] major risks facing the Company and review[] options for their mitigation"; and "oversee[] compliance with the Company's Code of Business Conduct, a statement of expected ethical conduct."

40.     The Individual Defendants, as directors and officers of Cabot, were also bound by the Company's Code of Business Conduct (the "Code").  The Code sets out basic principles to guide all directors, officers, and employees of Cabot, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.  With respect to the Company's compliance with laws, rules, and regulations, the Code states that Cabot's "directors, officers and employees will comply with the letter and the spirit of all applicable laws, rules and regulations and will conduct its affairs in

16

the highest moral and ethical manner possible." It adds, "[w]e obey laws, rules and regulations, whether we agree with them or not." Regarding compliance with applicable environmental protection laws, the Code states:

> It is Company policy to comply fully with the letter and the spirit of all applicable federal, state, and local environmental protection laws and regulations (the "Environmental Laws"). The Company will conduct operations in such a manner as to meet or exceed all Environmental Laws in its business activities. The Company will routinely review the conduct of its operations in an effort to strive for continuous improvement in its environmental performance.

41.     With respect to the Company's directors, officers, and employees' commitment to ensure Cabot's financial integrity and accurate records, the Code provides:

> It is the Company's policy to insist upon full, fair, accurate, timely and understandable disclosure in reports and documents the Company files with or submits to the SEC and in other public communications made by the Company.

> This requirement shall be applicable to the Company's CEO, senior financial officers and all other officers and employees who play a role in drafting, making or disseminating of these reports, documents and communications.

> Each employee, including the CEO and each senior financial officer, shall promptly bring to the attention of the Corporate Disclosure Committee any material information of which he or she may become aware that affects the disclosures made by the Company in its public filings or otherwise assist the Disclosure Committee in fulfilling its responsibilities as specified in the Company's Disclosure Control Policy and Procedures Manual.

42.     Cabot's Code of Business Conduct "define[s] certain responsibilities of the Company's employees" and "is [a] guide to ethical and lawful conduct and serves as a reminder of the policies, roles and laws that affect [their] performance."

43.     In a section titled, "Transactions in Securities" the Code of Business Conduct states that:

> The United States securities laws prohibit persons from trading on material information which has not been made public. No employee (nor any person acting on such employee's behalf) who is aware of material information relating to the

17

Company or another company that has not been generally available to the public …
may sell or purchase shares of the stock or other securities (or puts, calls or similar
options to buy or sell stock or other securities) of COGC or the other company.

## C.    Environmental, Health and Safety Committee Charter

44.    Cabot maintains a standing Environment, Health & Safety Committee ("EHS
Committee") (formerly, the Safety and Environmental Affairs Committee).  The purpose of the
EHS Committee as set forth in its Charter is "to provide assistance to the Board of Directors in
providing oversight and support of the Company's policies, programs and initiatives on the
environment, health and safety."   The EHS Committee Charter imposes several affirmative
obligations on the EHS Committee and its membership including, among other things:

1.    Overseeing and providing recommendations to the Board of Directors
regarding the Company's climate change and sustainability policies and
programs, including the Company's commitment to minimizing its impact on
the environment and protecting the health and safety of its workers and the
communities in which it operates, as well as overseeing and providing
recommendations on the reporting and public disclosure thereon.

2.    Monitoring and reviewing environmental matters and trends in such matters
that affect the Company's activities and performance, including the efficient
use of resources, energy sustainability, climate change and environmental
protection.

3.    Reviewing and providing input to management and the Board of Directors
regarding the Company's compliance with laws, regulations, policies, programs
and practices with regard to environmental, health and safety matters by, among
other things, receiving and reviewing with management reports regarding:

a.    the Company's management of and responses to releases, investigations,
notices of violations, remediations, civil action or other occurrences
involving environmental laws or regulations;

b.    the Company's safety program, including reports of incidents, statistics and
actions or investigations by any governmental body, as well as the
Company's response to the same;

c.    the Company's management of and responses to pending legislative and
regulatory efforts in the environmental, health and safety and areas likely to
significantly affect the Company's business;

      d.   environmental, health and safety matters relating to the Company's projects and operations and initiatives and training designed to improve the Company's performance with regard to such matters; and

      e.   the Company's efforts to gather data and communicate externally regarding its environmental, health and safety sustainability programs, initiatives and outcomes.

4.   Consulting with the Board of Directors and internal and external advisers of the Company, as appropriate, regarding the management of the Company's health, safety and environmental programs, trends in environmental compliance and the economic effect of such trends on the Company's business.

5.   Overseeing and reviewing all external disclosures regarding the Company's environmental, health and safety sustainability data, programs, initiatives and outcomes and providing insight and recommendations to the Board of Directors on such matters.

6.   Conducting an annual performance evaluation of the Committee.

7.   Reviewing the Committee charter annually and making recommendations to the Board of Directors for revisions, as appropriate.

8.   Reporting its actions and any recommendations to the Board of Directors after each Committee meeting.

## V.    FACTUAL BACKGROUND

### A.    Fracking Is an Inherently Dangerous Activity

45.    Cabot is primarily a fracking company.  Modern fracking refers to a technique used to enable the extraction of natural gas or oil from shale and other forms of impermeable rock formations that lock in oil and gas and make fossil fuel production difficult.  Large quantities of water, chemicals, and sand are blasted into these formations at pressures high enough to crack the rock, allowing the once-trapped oil and gas to flow to the surface to be captured by oil and gas operators, like Cabot.

46.    The process of drilling and fracking a well takes place in several stages.  Operators begin the fracking process by clearing and leveling the land, paving an access road for heavy truck traffic, and building a well pad for the drilling rig and other equipment.  Operators then use heavy

machinery to drill a hole, known as a wellbore, into the ground at the well site.  Drilling is gradually turned from vertical to horizontal and continues deep underground for several thousand more feet.

47.     Once drilling is complete, operators send explosives into the wellbore to perforate multiple holes in the rock.  The process of hydraulic fracturing begins here.  Gas is locked into rock formations called shale, and fractures are created in the shale by pumping large amounts of fluid at extremely high pressure down the wellbore and into the holes made by the explosives.  The base fluid is water, but a variety of potentially dangerous chemical additives are added to the water to help release the trapped gas.  Once released, gas can flow to the surface.

48.     The operators then insert piping, or casing, into the hole to stabilize the wellbore. To fill any voids through which gas such as methane might escape, drillers pour cement into spaces between the piping and the walls of the wellbore to secure the piping.

49.     Mounting public evidence has shown that fracking poses serious threats to human health and safety, creates air and water pollution, and directly impacts Earth's climate.  A 2016 analysis by the U.S. Environmental Protection Agency found that, while large data gaps and uncertainties make it difficult to fully assess the impact on drinking water, fracking operations can and do affect drinking water resources.  The activities that pose the biggest threats include spills and leaks of fracking fluids, the injection of fluids into inadequately built wells, and poor wastewater management practices.

**B.     Cabot Operates in a Highly Regulated Industry**

50.     Oil and gas drilling operators, including Cabot, are subject to federal, state, and local laws and regulations governing oil and gas exploration and the discharge of industrial waste. As Cabot explains:

> Our operations are subject to extensive federal, state and local laws and regulations relating to the generation, storage, handling, emission, transportation and discharge of materials into the environment.  Permits are required for the operation of our

20

various facilities.  These permits can be revoked, modified or renewed by issuing authorities.  Governmental authorities enforce compliance with their regulations through fines, injunctions or both.  Government regulations can increase the cost of planning, designing, installing and operating, and can affect the timing of installing and operating, oil and natural gas facilities.

51.    However, government regulation of an industry is only as effective as the agency in charge of enforcement, and in this respect, the PaDEP was ***initially*** unprepared for the fracking boom. Following the presentment of charges against Cabot, the Pennsylvania Attorney General released to the public a copy of *Report 1 of the Forty-Third Statewide Investigating Grand Jury* (hereinafter, "Forty-Third Grand Jury Report"), which "assesse[d] impacts on Pennsylvania of a new, lucrative but often destructive enterprise – the unconventional oil and gas industry, commonly known as 'fracking.'" *Id.* at page 1.[4]

52.    The grand jury found that the PaDEP was "initially unprepared for and at time overwhelmed by the challenges resulting from the new technologies of unconventional drilling – or, as it is known the general public, 'fracking.'" *Id*. at 48. Consequently, the PaDEP was left in a position of playing "catch up" (*see id.* at 53) against more experienced industry leaders, such as Cabot.

53.    Indeed, when the shale gas boom began in Pennsylvania, the grand jury found that the PaDEP "was still working from administrative regulations that were geared to a different era. The only regulations in place were those created to oversee conventional drilling – *e.g.*, old-fashioned oil wells." *Id*. at 49-50.

54.    Moreover, the Forty-Third Grand Jury Report documented that the PaDEP employees were similarly reliant upon outdated, pre-fracking knowledge, noting the PaDEP

---

[4]    The Forty-Third Grand Jury Report has been made publicly available and can be accessed at    https://www.attorneygeneral.gov/wp-content/uploads/2020/06/FINAL-fracking-report-w.responses-with-page-number-V2.pdf (last accessed June 10, 2024).

"didn't just need new rules; they needed new knowledge. The Department was faced with novel extraction technologies that no one knew anything about." *Id*. at 5. Moreover, the grand jury learned that the PaDEP:

> … *was relying on old, pre-fracking criteria – meaning [the PaDEP] employees weren't even looking for the new compounds used in unconventional drilling, and therefore couldn't accurately say whether it was causing contamination*. And the Department sometimes failed to take advantage of the law's most powerful feature: the "zone of presumption." *If water sources near a gas well showed contamination in the period soon after drilling and hydraulic fracturing, the burden was on the operator to disprove responsibility. But that presumption was not consistently enforced*.

*Id*. at 6.

55.    Nevertheless, at all pertinent times, the members of the Board had an independent obligation to proactively comply with Pennsylvania law—their duty was not simply to react to oversight being provided by the PaDEP. Rather, in addition to complying with the oversight provided by the PaDEP, the Board was further obligated to comply with the requirements of the the Pennsylvania State Constitution, the Pennsylvania Clean Streams Law, and the Oil and Gas Act.

### 1.    The Pennsylvania State Constitution

56.    At all pertinent times, the members of the Board had an obligation to comply with the Pennsylvania State Constitution.

57.    Indeed, the right of Pennsylvanians to clean water and air has been enshrined in the state's constitution. Article 1, Section 27 of the Constitution of the Commonwealth of Pennsylvania, known as the "Environmental Rights Amendment" provides:

> The people have a right to clean air, *pure water*, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including

generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. Art. I, § 27. The Environmental Rights Amendment was enacted by voters in, and has been a part of Pennsylvania's constitution since, 1971.

58.    Consistent with the above, additional Pennsylvania state laws guarantee the rights of its resident to pure water.

### 2.    The Pennsylvania Clean Streams Law

59.    The Company's drilling operations in Pennsylvania are further subject to Pennsylvania's environmental protection laws, including the Pennsylvania Clean Streams Law, 35 P.S. §§691.1 *et seq*. Pennsylvania enacted the Clean Streams Law to preserve and improve the purity of the state's waters for the protection of public health. The Clean Streams Law seeks to prevent further pollution of the state's waters, and also to restore its streams to a clean and unpolluted state. Water pollution includes the "contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare." To deter and prevent water pollution, the Clean Streams Law prohibits unauthorized discharges of industrial waste and provides certain penalties for polluters.

60.    Section 301 of the Clean Streams Law prohibits unauthorized discharges of "industrial waste," which broadly includes "any liquid, gaseous, radioactive, solid or other substance, not sewage, resulting from any manufacturing or industry." Further, "[n]o person or municipality shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Commonwealth any industrial wastes, except as hereinafter provided in this act."

61.    Section 307 of the Clean Streams Law adds:

> No person or municipality shall discharge or permit the discharge of industrial wastes in any manner, directly or indirectly, into any of the waters of the Commonwealth unless such discharge is authorized by the rules and regulations of the department or such person or municipality has first obtained a permit from the department.

62. Section 401 prohibits other types of pollutants, including any substances resulting in pollution. Section 401 states:

> It shall be unlawful for any person or municipality to put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined.

63. Section 602 of the Clean Streams Law adds criminal penalties against polluters. In particular, subsection (b) provides that, "[a]ny person or municipality who negligently violates any provision of this act, any rule or regulation of the department, any order of the department, or any condition of any permit issued pursuant to the act is guilty of a misdemeanor of the second degree." And section 602, subsection (b.1) provides that, "[a]ny person or municipality who intentionally or knowingly violates any provision of this act, any rule or regulation of the department, any order of the department, or any condition of any permit issued pursuant to the act is guilty of a felony of the third degree."

### 3.    The Pennsylvania Department of Environmental Protection

64. The PaDEP enforces the Clean Streams Law, determines when pollution has occurred, and formulates and adopts rules and regulations prohibiting the unauthorized discharge of industrial waste. The PaDEP also investigates alleged sources of pollution of Commonwealth waters, and institutes appropriate proceedings to discontinue any such pollution. The PaDEP may also issue orders as necessary to "aid in the enforcement of the provisions of [the Clean Streams Law]" or to modify, suspend, or revoke permits. In addition, it may issue orders that require

persons "to cease operations of an establishment which, in the course of its operation, has a discharge which is in violation of any provision of this act."

65.     The PaDEP, or local district attorneys, may refer violations of the Clean Streams Law to the Pennsylvania Office of the Attorney General under Section 205 of the Commonwealth Attorneys Act and Section 601 of the Clean Streams Law.

### 4.     The Oil and Gas Act

66.     The PaDEP also enforces the provisions Pennsylvania's Oil and Gas Act.  These rules require, *inter alia*, that operators properly case and cement their wells so as to prevent gas or other fluids from leaking into fresh groundwater.  25 Pa. Code §78.81(a)(2)-(3).  The rules also set cement and well construction standards and require that an operator report and correct defective, improper, or insufficient cement casings on gas wells.  25 Pa. Code §78.86; §78.85(a)(5).

### C.     Cabot's Drilling Operations in Pennsylvania Form a Substantial Part of Its Business, and the Implicated Wells Produced a Substantial Portion of the Company's Revenue

67.     For decades, Cabot has exploited the Marcellus Shale Deposit—a geological formation located underground beneath parts of Pennsylvania, West Virginia, Ohio, and New York containing significant quantities of natural gas—through fracking.  Cabot's operations are primarily located in the Marcellus Shale area of northeast Pennsylvania, principally located in Susquehanna County, Pennsylvania.

68.     Cabot began leasing mineral rights from residents in Dimock Township in 2006 and began constructing well pads and drilling wells on numerous properties shortly thereafter.

69.     Within a few years, it became clear that the region represented the Company's future.  In its 2009 Annual Report filed with the SEC on February 26, 2010—just over one year after the well explosion in Dimock—Cabot disclosed not only that the Dimock field in Susquehanna County contained more than 15% of the Company's proved gas reserves but that its

25

future fortunes were inextricably tied to expanding its drilling operations in the region.  Indeed, Cabot disclosed that it "ha[d] allocated [its] planned program for capital and exploration expenditures primarily to the Marcellus Shale in northeast Pennsylvania," where it planned to drill over 100 new wells.

70.    According to the Company's Form 10-K for the year ended December 31, 2014, its exploration, development, and production operations were "primarily concentrated in two unconventional plays—the Marcellus Shale in northeast Pennsylvania and the Eagle Ford Shale in south Texas." *See* FY14 Form 10-K at 7.[5] Substantially similar statements would be republished in Cabot's Form 10-Ks for the years ended December 31, 2015 and December 31, 2016.

71.    The Marcellus Shale was—by far—the Company's most important area of exploration and exploitation during this three-year period. According to the FY2014 Form 10-K, "Our Marcellus Shale properties represent our ***largest operating and growth area in terms of reserves, production and capital investment***." FY2014 Form 10-K at 7. Substantially similar statements also appeared in the Form 10-Ks for the years ended December 31, 2015 and December 31, 2016.

72.    More specifically, the Marcellus shale region had not only become Cabot's most productive asset but its brightest hope for future growth.  As Cabot disclosed in its 2014 Annual Report filed with the SEC on February 27, 2015:

> ***Our Marcellus Shale properties represent our largest operating and growth area in terms of reserves, production and capital investment***…. Our 2014 net

---

[5]    According to the Company's SEC filings, an "unconventional play" is "[a] term used in the oil and gas industry to refer to a play in which the targeted reservoirs generally fall into one of three categories: (1) tight sands, (2) coal beds or (3) shales. The reservoirs tend to cover large areas and lack the readily apparent traps, seals and discrete hydrocarbon-water boundaries that typically define conventional reservoirs. These reservoirs generally require fracture stimulation treatments or other special recovery processes in order to achieve economic flow rates." *See* FY2014 Form 10-K at 5; *see also* FY2020 Form 10-K at 6.

production in the Marcellus Shale was 479.8 Bcfe, representing approximately 90% of our total equivalent production for the year. As of December 31, 2014, we had a total of 469.0 net wells in the Marcellus Shale, the majority of which are operated by us.

73.    Cabot further disclosed its aggressive plans for future expansion in the region, disclosing its "plan[s] to spend approximately $900.0 million on capital and exploration activities," which included "drill[ing] approximately 125 gross wells (or 115.0 net), focusing our capital program in the Marcellus Shale in northeast Pennsylvania." By this point, the Dimock field in particular "contain[ed] more than 15% of [Cabot's] total proved reserves" and represented substantial year-over-year increased production volumes:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2014 | 2013 | 2012 |
| **Production Volumes** | | | |
| Natural gas *(Bcf)* | | | |
|   Dimock field | 479.8 | 356.5 | 209.3 |
|   Total | 508.0 | 394.2 | 253.2 |
| Oil (Mbbl)[1] | | | |
|   Total | 3,961 | 3,221 | 2,407 |
| Equivalents *(Bcfe)* | | | |
|   Dimock field | 479.8 | 356.5 | 209.3 |
|   Total | 531.8 | 413.6 | 267.7 |

74.    By 2017, the Marcellus Shale's importance to the Company would only increase. As reported in the Company's Form 10-K/A for the year ended December 31, 2017, the Company revised its disclosures regarding its primary operations, dropping the reference to Eagle Ford Shale in Texas, and advising investors that substantially all of Cabot's operations were now conducted almost ***exclusively*** in Pennsylvania. *See* FY2017 Form 10-K at 7 ("Our exploration, development and production operations are primarily concentrated ***in one unconventional play***—the Marcellus Shale in northeast Pennsylvania."). The Company repeated its disclosure that the Marcellus Shale "represent[s] our primary operating and growth area in terms of reserves, production and capital

investment." *Id*. Cabot's near-total dependence on its Marcellus Shale operations remained the status quo from this point forward.

75.    Cabot made good on its promise.  By 2020, Cabot's activities in the Marcellus Shale region drove its entire business.  As Cabot disclosed in its Annual Report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 Form 10-K") filed with the SEC on February 25, 2020:

> Our operations are primarily concentrated in one unconventional play—the Marcellus Shale in northeast Pennsylvania. ***Our Marcellus Shale properties represent our primary operating and growth area in terms of reserves, production and capital investment***…. Our 2019 net production in the Marcellus Shale was 865 Bcfe, representing substantially all of our total equivalent production for the year. As of December 31, 2019, we had a total of 788.0 net wells in the Marcellus Shale, of which approximately 99.5 percent are operated by us.

The Dimock field accounted for nearly all of Cabot's natural gas production:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| **Production Volumes** | | | |
| *Natural gas (Bcf)* | | | |
| Dimock field | 865.0 | 729.1 | 641.7 |
| Total | 865.3 | 729.9 | 655.6 |
| *Oil (Mbbl)* | | | |
| Total | — | .829 | 4,953 |
| *Equivalents (Bcfe)* | | | |
| Dimock field | 865.0 | 729.1 | 641.7 |
| Total | 865.3 | 735.0 | 685.3 |
| **Natural Gas Average Sales Price ($/Mcf)** | | | |
| Dimock field | $ 2.29 | $ 2.58 | $ 2.33 |
| Total (excluding realized impact of derivative settlements) | $ 2.29 | $ 2.58 | $ 2.30 |
| Total (including realized impact of derivative settlements) | $ 2.45 | $ 2.54 | $ 2.31 |
| **Oil Average Sales Price ($/Bbl)** | | | |
| Total (excluding realized impact of derivative settlements) | $ — | $ 64.51 | $ 47.81 |
| Total (including realized impact of derivative settlements) | $ — | $ 63.53 | $ 48.16 |
| **Average Production Costs ($/Mcfe)** | | | |
| Dimock field | $ 0.06 | $ 0.05 | $ 0.04 |
| Total | $ 0.06 | $ 0.05 | $ 0.11 |

76.    Cabot's 2020 Annual Report filed with the SEC on February 26, 2021, stated that by 2020, "[s]ubstantially all of [Cabot's] total company historical operational information and proved reserves are derived from our Dimock field in northeast Pennsylvania."

77.    Thus, Cabot's Pennsylvania fracking operations are critical to the Company's business.  As Cabot's 2020 Annual Report explains:

Our operations are primarily concentrated in one unconventional play—the
Marcellus Shale in northeast Pennsylvania. Our Marcellus Shale properties
represent our primary operating area and are principally located in Susquehanna
County, Pennsylvania, where we currently hold approximately 175,000 net acres in
the dry gas window of the play. Our 2020 net production in the Marcellus Shale
was 857 Bcfe, representing substantially all of our total equivalent production for
the year. As of December 31, 2020, we had a total of 865.9 net wells in the
Marcellus Shale, of which approximately 99.5 percent are operated by us.

78.    Further, when preparing their complaint, the Securities Fraud Plaintiffs prepared a

forensic analysis of the specific noncompliant wells appearing in the criminal Presentment of

Charges, concluding those non-compliant sites were responsible for a significant portion of

Cabot's overall gas production, ranging between 10%-19% of annual production.

79.    Moreover, the Securities Fraud Plaintiffs' forensic analysis indicates that the

affected wells generated ***approximately $1 billion in revenue*** for Cabot during the period spanning

February 22, 2016 and June 12, 2020, inclusive.

80.    By comparison, during the five-year period spanning the fiscal years ended

December 31, 2016 through December 31, 2020, Cabot's gross operating revenues were as

follows:

|  | Year Ended December 31, (in thousands) | | | | |
|---|---|---|---|---|---|
|  | **2020** | **2019** | **2018** | **2017** | **2016** |
| ***Operating Revenue*** | $1,446,624 | $2,066,277 | $2,188,148 | $1,764,219 | $1,155,677 |

81.    On average, Cabot was generating $1.7 billion per year in operating revenue over

the past five years. Accordingly, the wells implicated in the criminal complaint against Cabot

represented a significant percentage of Cabot's average operating revenue.

**D.    Cabot's Drilling Operations Cause an Explosion at a Local Residence**

82.    Susquehanna County has a long history of methane in surface and ground water resulting from the normal decomposition of organic matter.  This type of gas is termed "biogenic." Another type of underground gas can be created by a different process, termed "thermogenic." Thermogenic gas results from heat and pressure, over thousands or millions of years, in deep geologic strata.  It is locked under thousands of feet of rock and can only be reached by drilling down into the earth with industrial machinery.  Laboratory analysis can identify gas as either thermogenic or biogenic.

83.    Cabot never tested the predrill samples it took from Susquehanna County homeowners' drinking water wells located within a certain distance of a Cabot well pad for methane.  Thus, Cabot eliminated any ability to establish a baseline for promptly assessing and addressing stray gas migration issues.

84.    Cabot began constructing well pads and drilling gas wells shortly after acquiring mineral rights through leases with homeowners in Dimock Township in 2006.  Almost immediately thereafter, residents began to report issues with their water.  Some began to see effervescent gas bubbles in water drawn from their faucets, while others began noticing considerable sediment.

85.    On January 1, 2009, a well exploded in Dimock from a below-grade water well pit in a Dimock home owned by Norma Fiorentino.  Cabot denied any responsibility.  However, due to the close proximity of the water well supplying water to the Fiorentino home to the Company's wells, the PaDEP initiated an investigation to determine if the Company's gas drilling activities caused the explosion.

86.    During its investigation, the PaDEP found combustible gas present in wells that provide drinking water to homes near Cabot's wells.  The PaDEP also found elevated levels of dissolved methane present in drinking water wells near Cabot's wells.  By and large, the methane gas identified in the contaminated water in Susquehanna County has been thermogenic gas, caused by industrial drilling.

87.    After its investigation, the PaDEP concluded that Cabot's drilling had caused methane gas to migrate into the aquifer and Dimock residents' water wells, polluting Dimock's groundwater and private water supplies in direct violation of the Clean Streams Law and Oil and Gas Act.  Specifically, most of Cabot's gas well issues involved problems with the cement, wherein gas was able to flow while the cement was hardening, resulting in permanent channels, or the cement did not completely fill spaces between the pipe and the wellbore.

88.    The gas leakage issue became so pervasive that a 2010 documentary film titled "Gasland" recorded Dimock residents lighting their tap water on fire.

**E.    Cabot's Poor Environmental Controls Result in the 2009 Consent Order**

89.    On November 4, 2009, Cabot entered into a Consent Order and Agreement with the PaDEP (the "2009 Consent Order").

90.    In the 2009 Consent Order, the PaDEP found, among other things, that thirteen water wells in close proximity to Cabot gas wells had elevated levels of dissolved methane and combustible gas in water well headspaces.  These findings led the PaDEP to conclude that Cabot had "caused or allowed the unpermitted discharge of natural gas … into the groundwater," in violation of the Clean Streams Law.  The 2009 Consent Order further concluded that Cabot had failed to properly case and cement (or correct the improper cement casing) of certain gas wells, including the Gesford 3 Well, or to restore or replace certain affected water supplies, in violation

31

of the Oil and Gas Act.  The 2009 Consent Order detailed additional violations with respect to several of Cabot's other gas wells.

91.     The 2009 Consent Order required the Company to take all actions necessary to maintain compliance with all applicable environmental laws and regulations, including the Clean Streams Law, Oil and Gas Act, Solid Waste Management Act, and regulations under the Administrative Code.

92.     The 2009 Consent Order also commanded the Company to take particular corrective actions for its violations.  These corrective actions restricted Cabot's ability to begin fracking any existing wells or complete drilling any new wells within the "Affected Area" covered by the 2009 Consent Order, required Cabot to identify and provide potable water to residents within the Affected Area, and required Cabot to submit a plan to the PaDEP that identified testing procedures to ensure the integrity of the casing and cement on Cabot's wells.  The 2009 Consent Order mandated that Cabot "complete[] any and all actions to prevent the unpermitted discharge of natural gas (if any) from the Cabot Wells or any other well owned and/or operated by Cabot within the Affected Area and into the waters of the Commonwealth" by March 31, 2010.

93.     Upon signing the 2009 Consent Order, Cabot paid a civil penalty of $120,000.  This penalty constituted the largest ever issued by the PaDEP to a gas company.  The Company also stipulated to additional civil penalties if Cabot violated the 2009 Consent Order.

### F.     Cabot Fails to Live Up to the 2009 Consent Order

94.     In the first of many instances in which Cabot failed to fulfill its obligations to the PaDEP and the affected landowners, Cabot failed to abide by the terms of the 2009 Consent Order. Cabot did not meet its March 31, 2010 deadline to fix defective cement and well casings on certain wells and to prevent the unpermitted natural gas discharge into groundwater in violation of the Clean Streams Law and the Oil and Gas Act.  Cabot also failed to identify the specific corrective

actions needed to address certain of the gas wells that the PaDEP had already determined to have insufficient casing. Furthermore, during inspections in early 2010, the PaDEP identified five additional defective Cabot gas wells and another home water supply that was affected by gas migration.

95.    Given Cabot's failure to fulfill its obligations under the 2009 Consent Order, the PaDEP and the Company modified the 2009 Consent Order on April 15, 2010 (the "April 2010 Consent Order"). In the April 2010 Consent Order, the PaDEP ordered the Company to install permanent water treatment systems in the affected homes within thirty days, permanently shut three gas wells within forty days, and refrain from drilling any new wells in the Dimock area for at least a year and statewide until it meets the requirements of the new order. The PaDEP also ordered Cabot to pay a $240,000 fine, as well as $30,000 per month beginning in May 2010 until the PaDEP determined that the Company met its obligations under the 2009 Consent Order.

96.    In the April 2010 Consent Order, Cabot agreed that it would complete all of its obligations under the 2009 Consent Order and April 2010 Consent Order by November 1, 2010 and "have completely eliminated the unpermitted discharge of natural gas into the waters of the Commonwealth."

97.    The then-PaDEP Secretary Hanger called the action the "most aggressive" taken by Pennsylvania so far toward any company drilling in the Marcellus Shale. Hanger further described Cabot as having one of the worst reputations in the industry, "in a class by itself." He further reminded Cabot that it faced aggressive action if it failed to follow the environmental rules and regulations. In particular, Hanger stated:

> Companies drilling in the Marcellus Shale have the legal responsibility to design and construct their wells to keep all gas contained within the wells and to prevent gas from moving into fresh groundwater. These standards are not mere suggestions or recommendations. … ***Oil and gas companies doing business in Pennsylvania***

*will follow the environmental rules and regulations put in place to protect citizens
and our natural resources or face aggressive action by this department*.

98.    Cabot and the PaDEP entered into a second modified consent order on July 19,
2010 (together with the April 2010 Consent Order, the "Modified 2009 Agreement").

99.    On October 19, 2010, Hanger wrote an open letter to the citizens of Susquehanna
County impacted by the Company's ongoing failure to address stray gas migration issues.  The
letter stated that the PaDEP "was forced to take action since Cabot continues to deny responsibility
for the contamination, despite overwhelming evidence of its responsibility."  In particular, the
letter stated:

> The [PaDEP] recently announced a permanent solution to the drinking water
> problems in Dimock caused by gas migration from Cabot Oil & Gas Corporation
> wells.  *[The PaDEP] was forced to take action since Cabot continues to deny
> responsibility for the contamination, despite overwhelming evidence of its
> responsibility*. Since that announcement was made, Cabot has launched a public
> relations campaign and much misinformation has been brought forth concerning
> who will be party to that solution and who will end up paying for it.
>
> *Cabot is responsible for the gas migration that has caused families to be without
> a permanent water supply for nearly 2 years* and the Commonwealth of
> Pennsylvania will seek court orders to make Cabot pay for all costs. But we cannot
> wait for Cabot to fix the problems it caused and to do the right thing. In the interim,
> PENNVEST, an agency that finances water and sewer infrastructure projects, will
> be asked to provide funds to pay the estimated $11.8 million cost for Pennsylvania
> American Water Company to construct a new, 5.5-mile water main from its Lake
> Montrose treatment plant to provide water service to the residents of Dimock.
> Again, the Commonwealth of Pennsylvania will then aggressively seek to recover
> the cost of the project from Cabot.
>
> No one in Dimock or Susquehanna County will pay for it and local taxes will not
> be increased as the result of it. Residents along Route 29 will have the option to tap
> into the line if they so choose. No one will be forced to hook up to the new public
> water supply. The new water line will also boost the value of homes and businesses
> near it.
>
> *This action is being taken based on overwhelming evidence that proves the Cabot
> wells are the source of the contamination.* [The PaDEP] has collected ample
> evidence tying methane found in private water supplies to Cabot's wells. We have
> witnessed and chronicled bubbling gas and high pressure readings from a number
> of wells that prove poor well construction, and taken readings that show excessive

34

gas levels that could only exist in wells that are leaking. Sophisticated testing has "fingerprinted" gas samples and matched the gas found in five homes to the gas leaking from the nearby Cabot wells. Additionally, the gas wells in many cases are less than a thousand feet from the homes where, by law, it is presumed gas drilling caused any pollution of water wells that may result.

The residents of Dimock have already paid a high price for Cabot's unwillingness to accept responsibility and provide a satisfactory solution. Cabot will be the one paying the final bill. Perhaps next time Cabot will do the job right the first time and avoid expensive repairs.

### G.    Cabot's Continued Violations Result in the December 15, 2010 Consent Order

100.    Cabot again failed to adhere to its promises.  On December 15, 2020, the PaDEP and the Company entered into another Consent Order and Settlement Agreement (the "2010 Consent Order" or "COSA").  The 2010 Consent Order replaced the Modified 2009 Agreement. Defendant Dinges signed the 2010 Consent Order.

101.    By the time Cabot entered into the 2010 Consent Order, it had already paid $570,000 in fines to the PaDEP for its previous violations.  To avoid litigation and resolve the items set forth in the 2010 Consent Order, Cabot agreed to pay another $500,000.

102.    In the 2010 Consent Order, the PaDEP determined that Cabot's drilling activities affected eighteen water supplies, serving nineteen homes, in the Dimock Township area. Specifically, the PaDEP found that Cabot had failed to: (i) permanently restore or replace all of the affected water supplies as of September 2010; (ii) completely eliminate the unpermitted discharge of natural gas into local water supplies as of November 1, 2010; and (iii) plug or take other remedial actions at certain of the Dimock gas wells by November 13, 2010.  As a result, Cabot violated section 509 of the Oil and Gas Act and section 611 of the Clean Streams Law.

103.    The 2010 Consent Order further obligated Cabot to undertake a number of remedial actions, including:

(a)     taking all actions necessary to comply with all applicable environmental laws and regulations;

(b)     undertaking gas well pressure testing and providing the results thereof to the PaDEP;

(c)     conduct screening and sampling at affected water supplies once every two weeks until prescribed standards were met, then continue to screen and analyze each water supply at least once per quarter until the prescribed standards were met for eight consecutive quarters; and

(d)     bringing certain gas wells into compliance with the Oil and Gas Act and the Clean Streams Law.

104.     Additionally, the 2010 Consent Order obligated Cabot to pay the nineteen affected homeowners the greater of $50,000 or two times the assessed value of their property into nineteen escrow funds to "pay for or restore and/or replace the Water Supplies, or to provide for ongoing operating or maintenance expense."

105.     Finally, the 2010 Consent Order established a nine-square mile "box" that encompassed the impacted nineteen homes in Dimock Township (the "Box" or the "Dimock Box"). The 2010 Consent Order forbade Cabot from fracking any drilled but not yet fracked gas wells until it had complied with the PaDEP's requirements and received written notice from the PaDEP to that effect. The 2010 Consent Order further forbade Cabot from drilling or completing drilling any new gas wells until it had complied with the 2010 Consent Order and received written notice from the PaDEP to that effect.

106.     In the ten years following the 2010 Consent Order, the moratorium on drilling new wells in the Dimock Box has remained in effect. As the Grand Jury Presentment (defined and

discussed in more detail below) disclosed, Cabot undertook little to no remedial work on its gas wells, the source of the gas migration problem, until 2018.

## VI.  THE INDIVIDUAL DEFENDANTS BREACHED THEIR FIDUCIARY DUTY OF LOYALTY

107.    Since the 2010 Consent Order, the PaDEP has regularly scrutinized and admonished the Company for its defective gas wells and failures to comply with the laws for the protection of the environment and Pennsylvania's citizens.  In the face of these admonishments, Cabot routinely settled claims and paid fines while continuing to flout the environmental regulations.

108.    According to a Reuters article from March 10, 2016: "[a] federal jury ruled [that Cabot] must pay more than $4.2 million in damages to two families in northeastern Pennsylvania who said the company's fracking operations contaminated their ground water." *See* David DeKok, Pennsylvania families win $4.2 million damages in fracking lawsuit, REUTERS, Mar. 10, 2016, https://www.reuters.com/article/us-pennsylvania-fracking/pennsylvania-families-win-4-2-million-damages-in-fracking-lawsuit-idUSKCN0WC2I8.

109.    Cabot settled its lawsuit with the Ely family on or around September 21, 2017. In an article by *State Impact* (a reporting project of NPR member stations) reporting on the Ely settlement, journalists disclosed that as of September 26, 2017, Cabot had "racked up more than 130 drilling violations from state regulators at its Dimock wells." *See* Colaneri, K., *Last two Dimock families settle lawsuit with Cabot over water*, STATE IMPACT https://stateimpact.npr.org/pennsylvania/2017/09/26/last-two-dimock-families-settle-lawsuit-with-cabot-over-water/ (last accessed June 6, 2024).

A.    The 2020 Grand Jury Presentment

110.    On February 11, 2020, Pennsylvania's Forty-Third Statewide Investigating Grand Jury (the "Grand Jury") issued its Presentment No. 28 (the "Presentment") finding reasonable grounds to believe that various violations of the criminal laws have occurred with respect to Cabot's oil and gas drilling activities.  According to the Presentment, the investigations began in 2018, after county District Attorneys requested the assistance of the Office of the Attorney General.  The Presentment addressed Cabot's violations of Pennsylvania criminal statutes, "causing the widespread contamination of residential water supplies in Susquehanna County."

111.    The Grand Jury heard testimony regarding the mechanics of methane migration from multiple witnesses.  The Grand Jury learned that most of Cabot's gas well integrity issues involved problems with cement.  The Grand Jury learned that, in Cabot's initial sampling of wells and groundwater in Susquehanna County, "for reasons known only to Cabot management, Cabot never tested the samples for methane."  This failure to test eliminated the ability to establish a baseline for assessing and addressing stray gas migration.

112.    The Grand Jury learned that the PaDEP, on its own, was able to compensate for the lack of predrill methane data at Cabot's wells by reviewing water samples by other operators and area samples from other entities.  The PaDEP found that, dating back to 2009, drinking water supplies within Dimock Township had been infiltrated by stray gas migrating from Cabot's wells.  The sample locations "demonstrated excessively high methane levels, with the highest reading being 92 mg/l, a level far exceeding the point at which the gas-filled water can explode."  And "over 50 percent of the time, the concentration in the impacted water supplies was greater than 10 mg/l, the warning range for dangerous methane concentration.… [T]hese levels far exceed the 'background' methane level in that area of the Commonwealth."

113.     Due to the PaDEP's initial findings, the PaDEP took "a more comprehensive effort to address the Dimock methane migration crises." The Grand Jury heard testimony and reviewed documents regarding the 2010 Consent Order and the actions Cabot purportedly took to attempt to comply with the order. However, as of the date of the presentment, the "methane migration problem from Cabot wells has not completely abated." The Grand Jury heard testimony "*that Cabot undertook little to no remedial work on its gas wells, the source of the problem, until 18 months ago, (shortly after [the Grand Jury] investigation began) when it started work on certain wells.*"

114.     The Grand Jury heard testimony from the PaDEP Program Manager Seth Pelepko, "who has played an integral role in tracing the connection between Cabot's defective gas wells and the methane that has migrated into homeowner's drinking water wells." The Grand Jury also heard from Ken Kennedy, an Oil and Gas Inspector Supervisor at the PaDEP, "who has investigated integrity issues in Cabot's gas wells."

115.     Based on the evidence, the Grand Jury divided the Company's defective wells, what it called the "problem wells," into three separate categories: problem wells that were part of the 2010 Consent Order and were remediated prior to 2015; problem wells that were part of the 2010 Consent Order that were not remediated prior to 2015; and problem wells that were more recently drilled (and therefore not part of the 2010 Consent Order). The problem wells remediated prior to 2015 did not form the basis for charges because of the statute of limitations under the Clean Streams Law.

116.     Regarding problem wells drilled after 2015, the Grand Jury—through testimony and further documentation—found that certain of these wells had integrity issues that affected drinking water supplies. Cabot began drilling these wells outside of the Dimock box while still

addressing problem wells within the Dimock box that had been drilled in prior years. Specifically, Cabot drilled the Howell gas wells in Auburn Township in 2016, the Jeffers Farm gas wells in Harford Township in 2017, and the POWERS M wells in Auburn Township in 2019. Shortly after drilling these wells, problems appeared, and the PaDEP issued new NOVs to the Company.

117.    The Grand Jury detailed the landowner impact of the contaminated water supply. It described a homeowner that lived on a 183-acre farmland area in Dimock who had worked on many of Cabot's oil and gas well sites in the past. After the explosion in January 2009, this homeowner discovered his own ground water had been contaminated by methane gas because he was able to set the water from his kitchen faucet on fire. Testing of the well water revealed "astronomical" amounts of methane, ethane, propane, excessive levels of sodium, and magnesium. His family began experiencing health problems. Yet, when the homeowner attempted to work with Cabot to resolve the situation, they did nothing "other than just bringing [him] water, which didn't last very long." At one point his land was valued at $1.2 million, and at the time of the presentment was valued at just $153,000. The Grand Jury told several similar stories of neighboring landowners.

118.    The Grand Jury concluded that Cabot failed to correct conduct that polluted Pennsylvania waters and that criminal charges were appropriate. In particular, the Presentment stated:

> We find that, over a period of many years, and despite mounting evidence, Cabot Oil & Gas failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration. Indeed, some of these gas wells have been in place for more than a decade, yet Cabot has only recently taken steps to remediate them. In light of Cabot's long-term indifference to the damage it caused to the environment and citizens of Susquehanna County, these were not merely technical violations. We conclude that criminal charges are appropriate.

119.    The Grand Jury recommended that the Attorney General institute criminal proceedings against the Company and charge it with violations of 35 P.S. §691.301 (prohibition against discharge of industrial wastes), 35 P.S. §691.401 (prohibition against other pollutions), and 35 P.S. §691.611 (unlawful conduct).

### B.    The Pennsylvania Attorney General Files Criminal Charges Against the Company

120.    On June 15, 2020, AG Shapiro filed fifteen criminal charges based on violations of the 2010 Consent Order and violations in connection with other recently drilled wells in Susquehanna County. Additional criminal charges were also contemplated, but were not pursued due to statute of limitations concerns. The charges included nine felony charges and known violations of environmental laws, including violations of the Clean Streams Law against discharge of industrial waste from 2009 to 2018 in gas wells in Dimock; for failure to comply with the 2010 Consent Order; and from December 15, 2010 to January 9, 2020 for failure to remediate multiple NOVs.  The criminal charges included knowing violations of discharging industrial waste under the Clean Streams Law and for knowingly polluting waters in the state of Pennsylvania. 35 P.S. §691.301, 401.

121.    According to AG Shapiro, "Cabot has only recently taken steps to remediate them." AG Shapiro further stated that "the Grand Jury presentments prove that Cabot took shortcuts that broke the law" including by allowing known violations to persist unabated, and that the Grand Jury found "evidence of a company that placed profit over our laws." In fact, AG Shapiro found that the Company deliberately failed to test the methane levels in drinking water samples from its wells, stating that "Cabot's failure to test its pre-drill water samples for methane eliminated the ability to establish a baseline for promptly assessing and addressing the problem of stray gas…. In

41

essence, *they didn't test their samples so that there would be no proof that they were contaminating nearby water supplies*."

122.    In a June 25, 2020 press release concerning the Grand Jury's findings against Cabot, AG Shapiro described the Company's behavior as "repeated and systemic violation[s] of Pennsylvania environmental law."

123.    In connection with issuing the recommended criminal charges, the Grand Jury found in their findings of fact and recommendation of charges that "over a period of many years, and despite mounting evidence, Cabot Oil & Gas failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration," and stated that the Company's "long-term indifference to the damage it caused to the environment and citizens of Susquehanna County." The Pennsylvania Office of the Attorney General's own investigation was consistent with the facts and findings presented in the Grand Jury's report, leading AG Shapiro to conclude that probable cause existed to support that Cabot did engage in the alleged criminal activity and knowingly violated pertinent environmental laws and regulations in Pennsylvania. In particular, AG Shapiro found that the Company: "did knowingly discharge, permit to flow or continue to discharge or permit to flow, methane into groundwater" and "did knowingly fail to comply with orders of the department, including but not limited to the December 15, 2010 Consent Order and Settlement Agreement, when it failed to remediate its gas wells to eliminate the discharge of natural gas, which allowed contamination to continue unabated."

124.    H. Justus Brambly, Supervisory Special Agent at the Attorney General's office maintained in a sworn affidavit that he "reviewed the sworn testimony given by the witnesses before the Grand Jury and finds that it is consistent with the information contained within the Presentment" and "reviewed the evidence presented to the Grand Jury and finds that it comports

with the results of the OAG investigative efforts and findings as to the allegations contained in this instant criminal complaint" finding that based on the above, "there is probable cause to believe that the defendant, Cabot Oil and Gas corporation, committed the acts alleged therein, in violation of Pennsylvania law."

125.    In January 2022, after a preliminary hearing in the criminal case brought against the Company was postponed several times, counsel for the Company formally waived the hearing, enabling the charges to move forward to Susquehanna County Court for possible trial. In the midst of the waiver, the Company also communicated that it was discussing a settlement with the Attorney General's office. The Company's statement waiving the hearing maintained that it "demonstrates Coterra's goal of achieving an amicable resolution with the Office of Attorney General. We look forward to continued productive conversations with the Office of Attorney General." However, the Attorney General's office described the Company's waiver of the preliminary hearing to be "another successful step in our case against this defendant[]" and that "it is also a recognition that the evidence against them is sufficient to proceed in the criminal process."

126.    According to the Company's latest quarterly report filed on Form 10-Q with the SEC on May 3, 2022, "[t]he Company is vigorously defending itself against such charges; however, the proceedings could result in fines or penalties against the Company. At this time, it is not possible to estimate the amount of any fines or penalties, or the range of such fines or penalties, that are reasonably possible in this case."

127.    Despite the ongoing criminal charges moving forward against the Company, Cabot (in its post-merger state) has continued to drill gas wells across Pennsylvania and has drilled an additional 130 gas wells since charges were initiated by the Attorney General's office on June 15,

2020. Notably, the Company has surpassed any other driller in the state with how many wells it has drilled.

128.    Further, the 2020 Grand Jury Presentment concluded that Cabot's failure to remediate the gas migration issues in the Dimock Box amounted to "long-term indifference" that were "not merely technical violations" and recommended that the AG Shapiro charge the Company with criminal violations of the Pennsylvania Clean Streams Law.  The Grand Jury based their recommendation on testimony that Cabot had "undertook little to no remedial work on its gas wells, the source of the problem, until 18 months ago [mid-2018]," which was *eight years* after the 2010 Consent Order.  After an 18 month investigation, AG Shapiro agreed and, in 2020, charged Cabot with fifteen criminal charges based on (1) violations of the Clean Streams Law for discharge of industrial waste at the gas wells in Dimock from 2009 to 2018; (2) failure to comply with the 2010 Consent Order; and (3) failure to remediate multiple NOVs from December 2010 to January 2020.

## VII.   THE INDIVIDUAL DEFENDANTS MAKE AND APPROVE FALSE AND MISLEADING STATEMENTS

### A.  False and Misleading Statements

129.    From at least 2015 to the present, the Company's public disclosures concerning environmental matters and compliance with the Clean Streams Law, the Oil and Gas Act, and the December 2010 Consent Order, were materially misleading—often repeating the same boilerplate disclosures year in and year out. These boilerplate disclosures did not reflect the reality of Cabot's repeated violations of applicable law.

130.    On October 23, 2015, defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended

September 30, 2015 (the "3Q15 10-Q").  With respect to environmental matters, the report

provided only a boilerplate disclosure, stating:

> From time to time we receive notices of violation from governmental and
> regulatory authorities in areas in which we operate relating to alleged violations of
> environmental statutes or the rules and regulations promulgated thereunder. While
> we cannot predict with certainty whether these notices of violation will result in
> fines and/or penalties, if fines and/or penalties are imposed, they may result in
> monetary sanctions individually or in the aggregate in excess of $100,000.

131.    Attached to the 3Q15 10-Q were certifications pursuant to the Sarbanes-Oxley Act

of 2002 ("SOX") signed by defendants Dinges and Schroeder attesting to the accuracy of the filing,

the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.

132.    On February 22, 2016, defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley,

and Ralls caused Cabot to file its annual report on Form 10-K with the SEC for the period ended

December 31, 2015 (the "2015 10-K"), representing that the Company "substantially compl[ies]

with the Clean Water Act and related federal and state regulations."  Regarding environmental

matters, the 2015 10-K stated:

> On November 12, 2015, we received a proposed Consent Order and Agreement
> from the Pennsylvania Department of Environmental Protection (PaDEP) relating
> to gas migration allegations in an area surrounding several wells owned and
> operated by us in Susquehanna County, Pennsylvania. The allegations relating to
> these wells were initially raised by residents in the area in August 2011. We
> received a Notice of Violation from the PaDEP in September 2011 for failure to
> prevent the migration of gas into fresh groundwater sources in the area surrounding
> these wells. Since then, we have been engaged with the PaDEP in investigating the
> incident and have performed appropriate remediation efforts, including the
> provision of alternative sources of drinking water to affected residents. ***We believe***
> ***the source of methane has been remediated and are working with the PaDEP to***
> ***reach agreement on the disposition of this matter.*** The proposed Consent Order
> and Agreement is the culmination of this effort and, if finalized, would result in the
> payment of a civil monetary penalty in an amount likely to exceed $100,000, up to
> approximately $300,000. We will continue to work with the PaDEP to finalize the
> Consent Order and Agreement and bring this matter to a close.
>
> From time to time we receive notices of violation from governmental and
> regulatory authorities in areas in which we operate relating to alleged violations of
> environmental statutes or the rules and regulations promulgated thereunder. While

we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

133.    The 2015 10-K also assured investors that the Company had been engaged with the PaDEP regarding its investigation and that Cabot had "performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents."

134.    Attached to the 2015 10-K were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.

135.    Meanwhile, the Ely litigation resulted in an adverse verdict for Cabot. According to a *Reuters* article, on March 10, 2016: "[a] federal jury ruled [that Cabot] must pay more than $4.2 million in damages to two families in northeastern Pennsylvania who said the company's fracking operations contaminated their ground water." *See* David DeKok, *Pennsylvania families win $4.2 million damages in fracking lawsuit*, REUTERS, Mar. 10, 2016, https://www.reuters.com/article/us-pennsylvania-fracking/pennsylvania-families-win-4-2-million-damages-in-fracking-lawsuit-idUSKCN0WC2I8. The parties ultimately settled that litigation in 2017.

136.    On May 3, 2016, defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2016 (the "1Q16 10-Q"). Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls. Regarding environmental matters, the report stated, in relevant part:

On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and

operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. ***We believe the source of methane has been remediated and are working with the PaDEP to reach agreement on the disposition of this matter.*** The proposed Consent Order and Agreement is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $300,000. We will continue to work with the PaDEP to finalize the Consent Order and Agreement and bring this matter to a close.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

137.    Two days later, on July 29, 2016, defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2016 (the "2Q16 10-Q").  Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.   Regarding environmental matters, the report stated, in relevant part:

On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. ***We believe the source of methane has been remediated and are working with the PaDEP to reach agreement on the disposition of this matter.*** The proposed Consent Order and Agreement is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to

47

approximately $300,000. We will continue to work with the PaDEP to finalize the Consent Order and Agreement and bring this matter to a close.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

138.    On October 20, 2016, materials were distributed in advance of the Safety & Environmental Affairs Committee meeting which was scheduled to take place on Thursday, October 27, 2016. Defendants and committee members Ralls, Boswell, and Kelley received these materials; copies were also distributed to, inter alia, defendants Dinges and Schroeder.

139.    Included in these materials was a Company memorandum titled "Environmental/Operational Update." The memorandum included an update concerning the gas migration allegations related to various well sites, including but not limited to those at G. Shields, Ratzel, Costello 1V, Manzer, and Powers. Among other things, the memorandum indicated that methane levels remained elevated at several sites, including Costello 1V and Canfield Well 2 (part of the Board meeting minutes regarding the Manzer #3H and #4H gas migration cases).

140.    The Environmental/Operational Update memorandum further stated that the Company had not been, as previously reported to the PaDEP, using intermittent devices to control emissions at its sites, but instead had since at least 2011 been using the WellMark 6900—a "continuous bleed" device. Initial Company estimates provided that, of the 521 devices installed, some 430 were still active as of September 23, 2016—and 215 of those had been installed after August 23, 2011. Consequently, Cabot had not been in compliance with emission standards requirements since the "phase in period" to change devices ended on October 15, 2013, and had been incorrectly reporting its emission standards to the PaDEP.

141.    Then, on October 28, 2016, defendants Dinges, Schroeder, Ables, Best, Boswell,

Kelley, and Ralls caused Cabot to file its quarterly report on Form 10-Q with the SEC for the

period ended September 30, 2016 (the "3Q16 10-Q").  Attached were SOX certifications signed

by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all

material facts, and the effectiveness of Cabot's disclosure controls.  Regarding environmental

matters, the report included substantially identical language as appeared in the 2Q16 10-Q:

> On November 12, 2015, we received a proposed Consent Order and Agreement
> from the Pennsylvania Department of Environmental Protection (PaDEP) relating
> to gas migration allegations in an area surrounding several wells owned and
> operated by us in Susquehanna County, Pennsylvania. The allegations relating to
> these wells were initially raised by residents in the area in August 2011. We
> received a Notice of Violation from the PaDEP in September 2011 for failure to
> prevent the migration of gas into fresh groundwater sources in the area surrounding
> these wells. Since then, we have been engaged with the PaDEP in investigating the
> incident and have performed appropriate remediation efforts, including the
> provision of alternative sources of drinking water to affected residents. ***We believe
> the source of methane has been remediated and are working with the PaDEP to
> reach agreement on the disposition of this matter.*** The proposed Consent Order
> and Agreement is the culmination of this effort and, if finalized, would result in the
> payment of a civil monetary penalty in an amount likely to exceed $100,000, up to
> approximately $300,000. We will continue to work with the PaDEP to finalize the
> Consent Order and Agreement and bring this matter to a close.
>
> From time to time we receive notices of violation from governmental and
> regulatory authorities in areas in which we operate relating to alleged violations of
> environmental statutes or the rules and regulations promulgated thereunder. While
> we cannot predict with certainty whether these notices of violation will result in
> fines and/or penalties, if fines and/or penalties are imposed, they may result in
> monetary sanctions individually or in the aggregate in excess of $100,000.

142.    On February 27, 2017, defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley,

and Ralls signed and caused Cabot to file its annual report on Form 10-K with the SEC for the

period ended December 31, 2016 (the "2016 10-K"), representing that the Company "substantially

compl[ies] with the Clean Water Act and related federal and state regulations."  Attached were

SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the

filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.

Regarding environmental matters, the Company stated, in relevant part:

> On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents. ***We believe the source of methane has been remediated and we entered into a Consent Order and Agreement with the PaDEP on December 30, 2016. We agreed to pay a civil monetary penalty in the amount of approximately $0.3 million and to continue to provide alternative sources of drinking water to affected residents until the affected water supplies are permanently restored.*** Further, the related gas well is being permanently plugged. Following the plugging of the gas well, additional monitoring will be required to ensure the source of methane has been remediated. Cabot continues to work with the PaDEP to bring this matter to a close.

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

143.    Then, on October 30, 2017, defendants Dinges, Schroeder, Ables, Best, Boswell, Brock, Kelley, Ralls, and Watts caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2017 (the "3Q17 10-Q").  Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.  Regarding environmental matters, the report once again stated:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in

fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

144.    Upon publication of the Form 10-Q, Cabot's stock price continued to climb, closing at $27.19 on October 30, 2017, and increase of $0.44 per share (1.64%) over October 27, 2017. As the market continued to digest the news, the price of Cabot common stock continued climbing through November 2, 2017, closing at $28.26 per share. Between October 26, 2017 and November 2, 2017, Cabot common stock had increased in value by $3.61 per share, a 14.6% increase in just five trading days. It was during this surge that defendant Dinges sold nearly **$2 million** in common stock for his own personal benefit. *See* § VIII, *infra*.

145.    On February 14, 2018, in advance of the Company's Safety & Environmental Committee meeting scheduled for February 20, 2018, Cabot's Vice President and Company Secretary Deidre Shearer sent or caused to be sent to committee members and defendants Boswell, Brock, and Watts certain agendas and related materials, including *inter alia*, memoranda titled "COGC Environmental Statistics: FYE 2017" and "Gas Migration Allegations FY2017." Among others, defendants Dinges and Schroeder were also copied on this communication.

146.    Part of the preparatory materials included a chart summarizing NOVs against Cabot from year to year. 86 total violations were found in 2017, compared to 48 in 2016, and 55 in 2015. The Company had also paid some $111,228 in civil penalties in 2017, $282,689 in 2016, and $30,750 in 2015. Indicating the increased scrutiny that Cabot was facing from environmental regulators, the number of inspections had jumped from 390 in 2013 to 1,564 in 2017, with a high of 1,716 in 2016.

147.    On February 20, 2018, Cabot's Safety & Environmental Affairs Committee met. Present for this meeting were the committee members, defendants Boswell, Brock, and Watts. Also present were other directors and defendants Ables, Best, Kelley, and Ralls. Additionally,

defendants Dinges, Schroeder, and Stalnaker were present, along with other management attendees. According to the minutes of that meeting, when reviewing incident statistics from the fourth quarter and full year of 2017, Ganaway noted the inverse relationship between certain cost-cutting measures and incident rates, commenting that "as Cabot's hours worked and employee counts go down, the incident rates will tend to go up." Specifically addressing environmental matters, Ganaway reported that "there had been no new gas migration allegations *since the last meeting*."

148.    On March 1, 2018, defendants Dinges, Schroeder, Ables, Best, Boswell, Brock, Kelley, Ralls, and Watts signed and caused Cabot to file its annual report on Form 10-K with the SEC for the period ended December 31, 2017 (the "2017 10-K"), representing that the Company "substantially compl[ies] with the Clean Water Act and related federal and state regulations." Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.  Regarding environmental matters, the Company stated, in relevant part:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

149.    On April 27, 2018, defendants Dinges, Schroeder, Ables, Best, Boswell, Brock, Kelley, Ralls, and Watts caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2018 (the "1Q18 10-Q").  Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.  Regarding environmental matters, the report stated:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

150.    On July 27, 2018, defendants Dinges, Schroeder, Ables, Best, Boswell, Brock, Kelley, Ralls, and Watts caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2018 (the "2Q18 10-Q").  Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.   Regarding environmental matters, the report stated:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

151.    On August 20, 2018 at the EnerCome Oil & Gas Conference, defendant Schroeder even went so far as to call the Company's well drilling "environmentally friendly," stating:

> We have more wells that we're completing right now in the Upper Marcellus. And look to the February year-end reserve report for data on that. Question you might ask is, "Okay, why -- if you're doing them now, why don't you tell us sooner?" **_Because of the way we complete our wells in the field to be environmentally friendly, green, however you want to say it_**, a long time ago, several years ago, we changed our completion technique.

152.    On October 26, 2018, the Individual Defendants caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2018 (the "3Q18 10-Q"). Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.  Regarding environmental matters, the report stated:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

153.    And yet, on February 26, 2019, defendants Dinges, Schroeder, Ables, Best, Boswell, Brock, Kelley, Ralls, and Watts signed and caused Cabot to file its annual report on Form 10-K with the SEC for the period ended December 31, 2018 (the "2018 10-K"), representing that the Company "substantially compl[ies] with the Clean Water Act and related federal and state regulations." Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls. Regarding environmental matters, the Company stated, in relevant part:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

154.    On April 26, 2019, the Individual Defendants caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2019 (the "1Q19 10-Q"). Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls. Regarding environmental matters, the report stated:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

**B.  The Truth Begins to Emerge While the Individual Defendants Continue to Issue Materially Misleading Statements**

155.    On July 26, 2019, defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2019 (the "2Q19 10-Q").  Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.  Regarding environmental matters, the report stated:

> On June 17, 2019, we received two proposed Consent Order and Agreements ("CO&A") from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. ***The allegations relating to these wells were initially raised by residents in the area in March and June 2017, respectively, in the form of complaints about their drinking water supply. Since then, we have been engaged with the PaDEP in investigating the incidents and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the affected residents.*** We received Notices of Violation ("NOV") from the PaDEP in June and November, 2017, respectively, for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells.  With regard to the June 2017 NOV, we believe these water quality complaints have been resolved, and we are working with the PaDEP to reach agreement on the disposition of this matter. The proposed CO&A is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $215,000. We will continue to work with the PaDEP to finalize the CO&A, and to bring this matter to a close. With regard to the November 2017 NOV, The proposed CO&A, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PaDEP to finalize the CO&A, and to complete the ongoing investigation and remediation.
>
> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

156.    On this news, the Company's stock price fell $2.63, or 12%, to close at $19.16 per share on July 26, 2019.

157.    On October 25, 2019, defendants Dinges, Schroeder, Ables, Best, Boswell, Kelley, and Ralls caused Cabot to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2019 (the "3Q19 10-Q").  Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls. Regarding environmental matters, the report stated:

> On June 17, 2019, we received two proposed Consent Order and Agreements ("CO&A") from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. ***The allegations relating to these wells were initially raised by residents in the area in March and June 2017, respectively, in the form of complaints about their drinking water supply. Since then, we have been engaged with the PaDEP in investigating the incidents and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the affected residents.***  We received Notices of Violation ("NOV") from the PaDEP in June and November, 2017, respectively, for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells.  With regard to the June 2017 NOV, we believe these water quality complaints have been resolved, and we are working with the PaDEP to reach agreement on the disposition of this matter. The proposed CO&A is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $215,000. We will continue to work with the PaDEP to finalize the CO&A, and to bring this matter to a close. With regard to the November 2017 NOV, The proposed CO&A, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PaDEP to finalize the CO&A, and to complete the ongoing investigation and remediation.
>
> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

158.    On or around February 25, 2020, defendants Dinges, Schoreder, Ables, Best, Boswell, Delaney, Kelley, Ralls, and Watts caused Cabot to file with the SEC its Form 10-K for the year ended December 31, 2019 ("2019 10-K"). Attached were SOX certifications signed by defendants Dinges and Schroeder attesting to the accuracy of the filing, the disclosure of all material facts, and the effectiveness of Cabot's disclosure controls.

159.    Cabot's 2019 10-K relied on only boilerplate and opaque statements concerning the Company's legal exposure. For example, a disclosure on page 77 of the 2019 10-K titled "Legal Matters," stated only that:

> The Company is a defendant in various legal proceedings arising in the normal course of business. All known liabilities are accrued when management determines they are probable based on its best estimate of the potential loss. While the outcome and impact of these legal proceedings on the Company cannot be predicted with certainty, management believes that the resolution of these proceedings will not have a material effect on the Company's financial position, results of operations or cash flows.

160.    The 2019 10-K's risk disclosures were similarly unenlightening. At page 25 of the 2019 10-K, a risk disclosure described the risk of criminal enforcement from a governmental agency only in the most general terms. It said:

> ***We are subject to complex laws and regulations, including environmental and safety regulations, which can adversely affect the cost, manner or feasibility of doing business.***
>
>        Our operations are subject to extensive federal, state and local laws and regulations, including drilling, permitting and safety laws and regulations and those relating to the generation, storage, handling, emission, transportation and discharge of materials into the environment. These laws and regulations can adversely affect the cost, manner or feasibility of doing business. Many laws and regulations require permits for the operation of various facilities, and these permits are subject to revocation, modification and renewal. Governmental authorities have the power to enforce compliance with their regulations, and violations could subject us to fines, injunctions or both. These laws and regulations have increased the costs of planning, designing, drilling, installing and operating natural gas and oil facilities, and new laws and regulations or revisions or reinterpretations of existing laws and regulations could further increase these costs. In addition, we may be liable for environmental damages caused by previous owners or operators of property we

purchase or lease. Risks of substantial costs and liabilities related to environmental compliance issues are inherent in natural gas and oil operations. For example, we could be required to install expensive pollution control measures or limit or cease activities on lands located within wilderness, wetlands or other environmentally or politically sensitive areas. Failure to comply with these laws also may result in the suspension or termination of our operations and subject us to administrative, civil and criminal penalties as well as the imposition of corrective action orders. It is possible that other developments, such as stricter environmental laws and regulations, and claims for damages to property or persons resulting from natural gas and oil production, would result in substantial costs and liabilities.

161.    Then, on or around March 13, 2020, the Individual Defendants caused Cabot to publish its 2019 "Annual Report" to shareholders which contained a letter from defendant Dinges to Cabot's shareholders which stated that Cabot "*make[s] every effort to reduce and limit [its] impact on air, water and the environment* with the best technologies currently available." Dinges' letter further emphasized that Cabot's "commitment to free cash flow, return on capital, and return of capital back to shareholders *with the least possible impact to the environment* remains paramount in importance to us."

162.    Elsewhere, the Company's 2019 Annual Report stated that "*Cabot embraces environmental innovation* and is a leader in utilizing new technology to *reduce our overall impact on the environment.*"  The 2019 Annual Report continued that "[i]t is from this platform that we will continue *our efforts to improve the environment*, *being a beacon of light by doing the right thing.*"

### C.    Cabot's Own Former Geologist Confirms Statements at Issue are False and Misleading

163.    The amended complaint in the Securities Class Action contains statements from a geologist employed by Cabot in the Company's Pittsburgh office from 2011 to 2018 (the "Geologist").

164.    While at Cabot, the Geologist was responsible for assisting Cabot's engineers in drilling wells.  The Geologist was thus well-placed to confirm the problems that existed in the well-drilling process, causing the migration of methane into groundwater.

165.    The Geologist described how, when filling the space around a well casing with cement, a "micro-annular space" can sometimes be created which allows gases to escape, including into groundwater.   The Geologist explained also that cementing might otherwise be done improperly, failing to fill the required spaces with cement and thus creating a pathway for gases, like methane, to escape into nearby groundwater. The Geologist further described deficient cement jobs as a "ticking time bomb."

166.    The Geologist stated that Cabot would test the integrity of its wells by creating a "cement bond log." This involved putting a rod with sensors down the gas well; the sensors then emit soundwaves which bounce off the walls of the well casing and in the process can detect these micro-annular spaces where there is no cement.  The geologist further stated that these cement bond logs regularly revealed the absence of sufficient cement in Cabot well casings.  Moreover, the problem was often present in the "surface casing string," which was a secondary string of cement casing specifically intended to prevent gas from entering surrounding groundwater.  The geologist stated that this specific problem was "the number one issue for gas migration at the Company's drill sites."

167.    The Geologist stated that problems in well casings were so prevalent at Cabot that "when you saw a good [cement bond] log you were surprised."  Moreover, according to the geologist, this issue was not localized to the wells around Dimock, but was found in numerous Cabot wells. As recounted in the Securities Fraud Complaint, the Geologist helped drill approximately 120 wells for Cabot between 2011 and 2018, and reviewed cement bond logs for

as many as 80 of those wells. The Geologist estimated that as many as 50% of the logs indicated the well did not contain adequate cement in its annular space for the surface casing string. In other words, up to 40 of the 120 wells the Geologist personally helped drill appeared to contain insufficient cement. The Geologist further indicated that problematic wells were located in Cabot's "core area"—the Company's best acreage producing the highest quality gas for Cabot,

168.    According to the Geologist, cement bond log reports were circulated among Cabot's engineers and geologists.  The geologist believed that defendant Stalnaker also reviewed copies of the cement bond log reports, given that the geologist had seen the reports in Stalnaker's office.

169.    These problems with well casings often went unrepaired, due to the cost.  Once the surface casing string had set, it would take at least a day to repair and would cost the Company as much as $35,000 per day in downtime alone.  According to the geologist, Cabot was "all about doing things fast and as cost effectively as possible." Therefore, according to the Geologist, Cabot did not repair the known issues in its well casings.

170.    In addition to knowing about the problems with its wells' casings and doing nothing, the Company intentionally avoided testing surrounding groundwater to maintain plausible deniability in the event that its wells, with known problems in their casings, did in fact leak gas. The Geologist stated that the Company only tested water when it had to in response to complaints, because the Company knew that once it did test well water it was "attached" and "responsible" for that well.  The Geologist further described the Company's "no news is good news" stance when it came to not testing groundwater, and opined that this was due to the Company's desire to avoid financial obligations for any damage they caused to water wells.

171.    The Geologist's description of Cabot's drilling process during the Class Period is corroborated by information found on Cabot's own website, which states, for example, that "[m]aintaining an effective barrier between our oil and gas wells and water supplies is critical to the protection of these resources" and that "[m]ultiple strings of steel pipe, known as casing, are then cemented into place as each well section is drilled. The sections at the uppermost portion of the well are designed to provide specific protection for groundwater sources while later sections provide an isolated conduit for production."

172.    Cabot's website further states that: "[b]efore hydraulic fracturing begins, Cabot conducts a 'cement bond evaluation' using sound waves" and that "[a]ny anomalies observed during these tests are evaluated and necessary pre-emptive measures are taken to ensure wellbore integrity." Cabot's website also claims that the Company can offer landowners nearby Cabot drill sites "the opportunity to have their water resource supply tested at our expense," including for "general water quality indicators, metals, dissolved gases, and petroleum constituents." Such statements are flatly contradicted by the grand jury's findings that Cabot failed to address well integrity issues after the cement bond evaluations or test water supplies for baseline methane levels at affected residential water wells.

173.    The Geologist further explained that Stalnaker was in "constant," near daily communication with Dinges and others at Cabot's Houston headquarters, and that Stalnaker had remarked that he spoke with Dinges "regularly." Stalnaker would request information for his calls with Dinges, and the Geologist observed Buddy Wylie, an Exploration Manager in Pennsylvania, meeting with Stalnaker in preparation for these calls. As recounted in the Securities Fraud Complaint, the Geologist further stated that Stalnaker attended and presented at Cabot's Board meetings and kept the Board apprised of Cabot's Pennsylvania operations. Over the course of

several weeks, Cassie Culpepper,[6] a Geologic and Geophysical Technician in Cabot's Pittsburgh office, prepared PowerPoint slide decks for Stalnaker to present at Board meetings. Information from across all Cabot departments was compiled into the slide deck and provided to Dinges before final approval. The presentations included information concerning drill sites for wells and their status. At least twice a year, following Board meetings, Stalnaker held all-hands meetings in Pennsylvania to provide Cabot employees highlights from the Board meetings.

174.    Per the Geologist, Stalnaker was also involved in preparing Cabot's SEC filings. The Pittsburgh office, including the Geologist's department, participated in contributing information for the SEC filings, such as data regarding well drilling, completions and production. During the preparation of this data for Cabot's SEC filings, meetings were held over the course of multiple weeks. Stalnaker attended these meetings and conducted presentations near the end of the process.

175.    The Geologist explained that all stray gas leaks or gas migration were reported by managers to Stalnaker, including slide presentations explaining the problem. Remedial costs required Stalnaker's authorization, and all funds Authorized for Expenditure (AFE) over $25,000 required his signature as part of Cabot's internal accounting and financial controls. Well expenses and any additional costs, such as for remediation, were included in a package that was forwarded to Stalnaker for approval. The Geologist had "no doubt" that Stalnaker knew about every Notice of Violation and every single action the Company performed to remediate, and described that Stalnaker was informed of every NOV that Cabot received from the PaDEP. The Company regarded NOVs as a "crisis." The Geologist observed Stalnaker attend closed-door meetings with

---

[6]    Culpepper was regularly referred to as the "Board Slide Queen" and the "PowerPoint Presentation go-to for VP." In total, she prepared approximately 6-10 presentations per year.

regulatory managers when compliance problems occurred. The Geologist recalled being requested to prepare reports and diagrams based on problems at well sites, such as the loss of cement. In addition, the Geologist believed that Stalnaker, either directly or through another, informed Cabot's headquarters in Houston, including Dinges, regarding NOVs, because Cabot's legal department was located in Houston, and Stalnaker and Cabot's Pittsburgh office required legal support to address the violations. The Geologist also believed that NOVs were forwarded to Deidre Shear, Cabot's Vice President and Managing Counsel in Houston.

176.     The Geologist's statements provide additional support for the grand jury's findings, following its investigation, that Cabot demonstrated "long-term indifference" "over a period of many years, [ ] despite mounting evidence" and "failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration."

### D. Cabot's Former Environmental Health & Safety Manager Likewise Confirms Statements at Issue are False and Misleading

177.     The Securities Fraud Complaint is likewise bolstered by the account of a former Environmental Health & Safety Manager for a wholly-owned subsidiary of Cabot in Susquehanna County from 2017 to 2019 (the "EHS Manager"). The EHS Manager participated in weekly Cabot Environmental Health & Safety conference calls with Cabot's Houston headquarters, reporting directly to Gordon Ganaway, Cabot's Director of Safety & Environmental Compliance.

178.     During these weekly conference calls, Cabot's headquarters received safety and environmental updates concerning outstanding issues and remedial efforts. There also would be discussion and updates about issues with PaDEP, violations, and related matters. The EHS Manager's account confirms there were gas migration issues into wells and water supplies, and the resultant landowner complaints were discussed on these calls. Such discussions included, but

were not limited to, complaints arising from Susquehanna County, Pennsylvania—including aged violations in Dimock, Pennsylvania.

179.    Content from the weekly conference calls was incorporated by Mr. Ganaway into a quarterly Environmental Health & Safety report, which would be presented to the Board on that basis. The EHS Manager would enter information into a template provided by Mr. Ganaway concerning incidents, claims, injuries, accidents, and the like. The template would then be returned to Mr. Ganaway, whereupon it would be incorporated into the quarterly reports which would be provided to Dinges, other Board members, and certain individuals operating in the Pittsburgh office and area.

### E. Cabot's Former Environmental Health & Safety Specialist Likewise Confirms Statements at Issue are False and Misleading

180.    One of Cabot's former Environmental Health & Safety Specialists (the "EHS Specialist"), who was employed with the Company from 2011 to 2021 also supported the allegations in the Securities Fraud Complaint. The EHS Specialist dealt with the PaDEP on issues related to air quality and water withdrawal permits, and corroborated the weekly Cabot Environmental Health & Safety conference calls described by the EHS Manager, *supra*.

181.    The EHS Specialist confirms that Ganaway led the weekly conference calls, which began sometime in 2016. The weekly calls included, inter alia, : (i) detailed discussions and reports on remediation issues; (ii) current and ongoing issues with the PaDEP and their status; and (iii) additional violations. According to the EHS Specialist, these conference calls included Cabot's Regional Manager – Environmental for the Pennsylvania Region John Smelko, in addition to its Environmental Supervisor Andy Mehalko.

182.    The EHS Specialist further confirmed that the purpose of the weekly Environmental Health & Safety conference call was to update headquarters regarding safety and environmental

issues and remediation in the Susquehanna County area. Accordingly, discussions necessarily included failures to remediate. Gas migration issues, including landowner complaints, were also discussed on weekly calls—more than once if it reflected an ongoing issue. Further, the EHS Specialist noted heightened concerns when gas migration complaints involved methane. The EHS Specialist commented that the "Dimock issue" began before they started at Cabot but was an ongoing issue while they were at the Company.

183.    According to the EHS Specialist, an ongoing log was maintained on a shared drive for participants within the Company to review and update. The log, essentially, was a formatted spreadsheet which recorded the date of the report, who reported the issue, what was initially done, steps taken to correct the issue, and what was outstanding. Major issues would be recorded in the log while also receiving unique reports and files. When major issues were included on the log that were not remediated immediately, the EHS Specialist explained that the issue would remain on the log and would state "correction ongoing" or something to that effect. The EHS Specialist stated that Mr. Ganaway would have been made aware of such major issues.

184.    Quarterly update reports were prepared based on the log, and were prepared in advance of Board meetings. The EHS Specialist reviewed parts of the quarterly report for accuracy, which was often condensed to three to four pages so it would be in a usable format for Board members. According to the EHS Specialist, all gas migration cases were included in these quarterly reports due to potential liability considerations. However, other environmental issues were only included if their cost was deemed sufficiently high to warrant Board member attention. The EHS Specialist described a rule of thumb whereby the Board was made aware of other costs only if the cost was approximately $25,000 – $50,000 or higher.

65

## VIII. DEFENDANT DINGES SELLS STOCK AT ARTIFICIALLY INFLATED PRICES BASED ON NON-PUBLIC INFORMATION

185.    Defendant Dinges was Cabot's CEO and a director and, as set forth herein, possessed material non-public information regarding Cabot's business condition and model. Defendant Dinges consciously acted to exploit his knowledge by selling over $1.8 million of Cabot stock in a single day to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| 11/02/2017 | 66,610 | $27.92 | $1,859,751 |

186.    Defendant Dinges thus used his fiduciary position to enrich himself and failed to discharge his duty to cause the Company to candidly reveal the truth about its business condition.

## IX. THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO REPURCHASE STOCK AT ARTIFICIALLY INFLATED PRICES

187.    The Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company.  In total, Cabot spent an aggregate amount of over $1.15 billion to repurchase approximately 48.6 million shares of its own common stock at artificially inflated prices from May 2017 through June 2019.

188.    According to the 2Q17 10-Q, Cabot purchased 750,000 shares of its common stock for approximately $17 million at an average price of $22.65 per share during May 2017, and purchased 2,293,246 shares of its common stock for approximately $51 million at an average price of $22.33 per share during June 2017. As the Company's stock was actually only worth $19.40 per share, the price at closing on June 15, 2020 when the truth was revealed, the Company overpaid by approximately $9.1 million for stock repurchases during May and June 2017.

189.    According to the 2017 10-K, Cabot purchased 117,900 shares of its common stock for approximately $4.9 million at an average price of $27.81 per share during November 2017, and purchased 1,822,100 shares of its common stock for approximately $50.5 million at an average

price of $27.71 per share during December 2017. As the Company's stock was actually only worth $19.40 per share, the price at closing on June 15, 2020, the Company overpaid by approximately $16.6 million for stock repurchases during November and December 2017.

190.    According to the 1Q18 10-Q, Cabot purchased 8,327,781 shares of its common stock for approximately $206.9 million at an average price of $24.85 per share during March 2018. As the Company's stock was actually only worth $19.40 per share, the price at closing on June 15, 2020, the Company overpaid by approximately $45.4 million for these stock repurchases.

191.    According to the 2Q18 10-Q, Cabot purchased 1,645,998 shares of its common stock for approximately $38.5 million at an average price of $23.40 per share during April 2018, and purchased 10 million shares of its common stock for approximately $235.6 million at an average price of $23.56 per share during June 2018. As the Company's stock was actually only worth $19.40 per share, the price at closing on June 15, 2020, the Company overpaid by approximately $48.2 million for stock repurchases during April and June 2018.

192.    According to the 3Q18 10-Q, Cabot purchased 39,037 shares of its common stock for approximately $892,776 at an average price of $22.87 per share during August 2018, and purchased 7,131,508 shares of its common stock for approximately $161.7 million at an average price of $22.67 per share during September 2018. As the Company's stock was actually only worth $19.40 per share, the price at closing on June 15, 2020, the Company overpaid by approximately $23.4 million for stock repurchases during August and September 2018.

193.    According to the 2018 10-K, Cabot purchased 2,829,455 shares of its common stock for approximately $65.5 million at an average price of $23.17 per share during October 2018, and purchased 8.5 million shares of its common stock for approximately $194.1 million at an average price of $22.84 per share during December 2018. As the Company's stock was actually

only worth $19.40 per share, the price at closing on June 15, 2020, the Company overpaid by approximately $40 million for stock repurchases during October and December 2018.

194.    According to the 2Q19 10-Q, Cabot purchased 80,933 shares of its common stock for approximately $2 million at an average price of $25.47 per share during April 2019; purchased 2.25 million shares of its common stock for approximately $57.2 million at an average price of $25.44 per share during May 2019; and purchased 2.75 million shares of its common stock for approximately $65.8 million at an average price of $23.95 per share during June 2019. As the Company's stock was actually only worth $19.40 per share, the price at closing on June 15, 2020, the Company overpaid by approximately $26.6 million for stock repurchases during April, May, and June 2019.

195.    In sum, the Company overpaid for repurchases of its own stock by over $209 million.

## X.   DAMAGES TO THE COMPANY

196.    As a direct and proximate result of the Individual Defendants' conduct, Cabot has been and will continue to be seriously harmed. Such harm includes, but is not limited to:

a)    Legal and professional fees in connection with the criminal investigation and criminal charges brought by the Pennsylvania Attorney General;

b)    Civil penalties paid to regulators for violations of applicable environmental regulations;

c)    Expenses incurred in connection with remedial efforts;

d)    Excess funds expended for the stock repurchases;

e)    Legal fees incurred in connection with the Securities Class Action;

f)    Any funds paid to settle the Securities Class Action; and

g)    Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Cabot.

197.    In addition, Cabot's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

198.    The actions complained of herein have irreparably damaged Cabot's corporate image and goodwill.  For at least the foreseeable future, Cabot will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Cabot's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## XI.    DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

199.    Plaintiff brings this action derivatively in the right and for the benefit of Cabot to redress injuries suffered, and to be suffered, by Cabot as a direct result of breaches of fiduciary duty by the Individual Defendants, insider trading (*i.e.*, *Brophy* claim), waste of corporate assets, and unjust enrichment, as well as for contribution for violations of Section 10(b) of the Exchange Act.  Cabot is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

200.    Plaintiff will adequately and fairly represent the interests of Cabot in enforcing and prosecuting its rights.

201.    Plaintiff has continuously been a shareholder of Cabot at times relevant to the wrongdoing complained of and is a current Cabot shareholder.

202.    On March 21, 2024, Plaintiff made a pre-suit litigation demand (the "Litigation Demand") on the present Coterra Board of Directors, attached hereto as Exhibit 1. Plaintiff

demanded the Coterra Board of Directors investigate, address, remedy, and commence proceedings against certain of the Company's current and former officers and directors for mismanagement and breaches of fiduciary duties. Plaintiff urged the Coterra Board of Directors to commence these legal proceedings as expeditiously as possible, and to secure tolling agreements from all potential defendants in order to toll the quickly approaching statute of limitations for breaches of fiduciary duty under Texas law. *See In re Whittington*, 530 B.R. 360, 398 (Bankr. W.D. Tex. 2014) ("Under Texas law, claims for breach of fiduciary duty must be brought within four years of the alleged breach.").

203.    Plaintiff also demanded that the Coterra Board of Directors reform and improve its corporate governance and internal procedures to comply with all applicable laws and to protect Cabot from committing future wrongful or wasteful acts. Specifically, Plaintiff demanded that the Coterra Board of Directors, *inter alia*: (i) commence a civil action against each responsible individual to recover for the benefit of the Company; (ii) assess whether any third parties should be sued, such as Cabot's financial advisors, auditors, or attorneys; (iii) adopt corporate governance improvements for Cabot immediately.

204.    Over a month later, on April 23, 2024, Peter A. Stokes, an attorney for Cabot, acknowledged the Company's receipt of the Litigation Demand and that the Coterra Board of Directors "will consider your letter and will respond in due course."

205.    On May 31, 2024, Plaintiff sent another letter to the Coterra Board of Directors again expressing concern about impending statute of limitations concerns given that the Coterra Board of Directors had thus far delayed consideration of the Litigation Demand, and that, pursuant to Texas law, where the Company is headquartered, the statute of limitations for claims of breaches

of fiduciary duty against the Individual Defendant for the misconduct alleged in the Litigation Demand would expire on June 12, 2024.

206.     Plaintiff's letter noted that a failure of the Coterra Board of Directors to take action prior to the expiration of the statute of limitations would irreparably damage the Company. For this reason, Plaintiff's letter kindly asked the Coterra Board of Directors again to protect the Company's claims against the Individual Defendants and requested the Coterra Board of Directors to take steps necessary to secure tolling agreements from the Individual Defendants to be dated as of the date the Litigation Demand was sent, but in no event after June 12, 2024, which would be later than four years after the date the Relevant Period ended.

207.     Just three business days before the statute of limitations period would run for the Company's breach of fiduciary duty claims against the Individual Defendants—causing irreparable harm to the Company—counsel on behalf of the Coterra Board of Directors wrote to Plaintiff requesting further trade documentation from Plaintiff. Plaintiff responded that Plaintiff would agree to furnish further trade documentation after the Coterra Board of Directors secures tolling agreements for the Individual Defendants.

208.     The Coterra Board of Directors has not responded to Plainitff, or taken any actions to reform or improve the Company's corporate governance and internal procedures and has taken no action to secure tolling agreements despite multiple months passing since receiving the Litigation Demand. Accordingly, the Company remains exposed to additional harm from the wrongful conduct described herein and is not protected against the running of the statute of limitations. Therefore, Plaintiff's Litigation Demand was wrongfully refused and Plaintiff brings this action to prevent irreparable harm to the Company.

## COUNT I
### Against Defendants Dinges, Schroeder, and Stalnaker for Breach of Fiduciary Duty

209.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

210.    Defendants Dinges, Schroeder, and Stalnaker owed and owe Cabot fiduciary obligations.  By reason of their fiduciary relationships, these defendants owed and owe Cabot the highest obligation of loyalty and care. Defendants Dinges, Schroeder, and Stalnaker, and each of them, violated and breached their fiduciary duties.

211.    Accordingly, defendants Dinges, Schroeder, and Stalnaker breached their duty of care and loyalty to the Company.

212.    In breach of their fiduciary duties owed to Cabot, defendants Dinges, Schroeder, and Stalnaker willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.  In particular, defendants Dinges, Schroeder, and Stalnaker knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

213.    As a direct and proximate result of defendant Dinges's, Schroeder's, and Stalnaker's breaches of their fiduciary obligations, Cabot has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II
### Against Dinges, Schroeder, and Stalnaker for Contribution
### For Violations of Sections 10(b) and 21D of the Exchange Act

214.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

215.    Defendants Dinges, Schroeder, and Stalnaker are named as defendants in the related Securities Class Action. The conduct of these defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

216.    Cabot is named as a defendant in related securities class actions that allege and assert claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If Cabot is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of defendants Dinges, Schroeder, and Stalnaker as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from defendants Dinges, Schroeder, and Stalnaker in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

217.    As officers, directors and otherwise, defendants Dinges, Schroeder, and Stalnaker had the power or ability to, and did, control or influence, either directly or indirectly, Cabot's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

218.    Defendants Dinges, Schroeder, and Stalnaker are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

219.    Defendants Dinges, Schroeder, and Stalnaker have damaged the Company and are liable to the Company for contribution.

220.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## COUNT III
### Against Defendants Ables, Best, Boswell, Brock, Delaney Kelley, Ralls, and Watts for Breach of Fiduciary Duty

221.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

222.    Defendants Ables, Best, Boswell, Brock, Delaney Kelley, Ralls, and Watts owed and owe Cabot fiduciary obligations.  By reason of their fiduciary relationships, these defendants owed and owe Cabot the highest obligation of loyalty and care.  Defendants Ables, Best, Boswell, Brock, Delaney Kelley, Ralls, and Watts, and each of them, violated and breached their fiduciary duties.

223.    Defendant Ables, Best, Boswell, Brock, Delaney Kelley, Ralls, and Watts, as directors of the Company, owed Cabot the highest duty of loyalty.  Accordingly, these defendants breached their duty of loyalty to the Company.

224.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

225.    The conduct of defendants Ables, Best, Boswell, Brock, Delaney Kelley, Ralls, and Watts set forth herein was due to their intentional or reckless breach of the fiduciary duties they

owed to the Company. Defendants Ables, Best, Boswell, Brock, Delaney Kelley, Ralls, and Watts intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Cabot.

226.    In breach of their fiduciary duties owed to Cabot, defendants Ables, Best, Boswell, Brock, Delaney Kelley, Ralls, and Watts willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

227.    In particular, defendants Ables, Best, Boswell, Brock, Delaney Kelley, Ralls, and Watts knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

228.    As a direct and proximate result of the breaches of their fiduciary obligations by defendants Ables, Best, Boswell, Brock, Delaney Kelley, Ralls, and Watts, Cabot has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets. As a result of the misconduct alleged herein, defendants are liable to the Company.

<u>**COUNT IV**</u>
**Against Defendant Dinges – *Brophy* Claim**

229.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

230.    As alleged above, defendant Dinges is a fiduciary of Cabot, possessed material, non-public information of Cabot, and used that information to improperly profit from the sale of Cabot stock. When Dinges directed the stock sale set forth above, he was motivated to do so, in

whole or in part, by the substance of the material, non-public information he possessed, and he acted with scienter.

231.    When Dinges sold his Cabot stock, he knew that the investing public was unaware of the negative material information that they possessed.  He also knew that if the information were disclosed, the market price of Cabot stock would be significantly lower. Dinges timed his stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock he sold.  He thereby benefitted by misappropriating Cabot's non-public information.

232.    Plaintiff, on behalf of Cabot, has no adequate remedy at law.

## COUNT V
### Against the Individual Defendants for Waste of Corporate Assets

233.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

234.    The Individual Defendants breached their fiduciary duties and, thereby, caused Cabot to waste its assets, expend millions of dollars of corporate funds, and impair its reputation and credibility for no legitimate business purpose, as a result of which the Company has been and continues to be substantially damaged.

235.    In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

236.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT VI
## Against the Individual Defendants for Unjust Enrichment

237.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

238.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Cabot.

239.    The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Cabot that was tied to the performance or artificially inflated valuation of Cabot, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

240.    Plaintiff, as a shareholder and representative of Cabot, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

241.    Plaintiff on behalf of Cabot has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Cabot, demand judgment as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Cabot and that Plaintiff is an adequate representative of the Company;

B.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties,

waste of corporate assets, and unjust enrichment;

C.      Declaring that defendants have breached their fiduciary duties to Cabot;

D.      Directing Cabot to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Cabot and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen Cabot's oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of Cabot to nominate at least four candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Cabot has an effective remedy;

F.      Awarding to Cabot restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

Case 4:24-cv-02223   Document 1   Filed on 06/11/24 in TXSD   Page 82 of 83

G.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to FED. R. CIV. P. 38(b), Plaintiff demands a trial by jury.

Dated: June 11, 2024

**THE BROWN LAW FIRM, P.C.**

*/s/ Saadia J. Hashmi*

Saadia J. Hashmi, Tx. Bar No. 3871412
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: shashmi@thebrownlawfirm.net
     tbrown@thebrownlawfirm.net

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

***Counsel for Plaintiff***

## **VERIFICATION**

I, Leon A. Fischer, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6/10/2024 day of June, 2024.

DocuSigned by:

*Leon Fischer*

BDBA5E3924DB413...

Leon A. Fischer